The STATE of Ohio, Appellee,

v.

DUNCAN, Appellant.

[Cite as *State v. Duncan,* 154 Ohio App.3d 254, 2003-Ohio-4695.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020016.

Decided Sept. 5, 2003.

Michael K. Allen, Hamilton County Prosecuting Attorney, and Anita P. Berding, Assistant Prosecuting Attorney, for appellee.

H. Fred Hoefle, for appellant.

MARK P. PAINTER, Judge.

{¶ 1} We reverse defendant-appellant Thomas Duncan's convictions for murder, felony murder, and voluntary manslaughter, due to erroneous jury instructions by a visiting trial judge. The judge mistakenly told the jury that it could find Duncan guilty on both murder counts, in addition to the voluntary-manslaughter count, for causing the death of Raciel "Chubby" Baldwin. The jury returned three guilty verdicts that included a firearm specification for each count. Duncan was sentenced for the murder count. The state concedes that this was an error.

{¶ 2} Because voluntary manslaughter is an inferior degree of murder, the verdicts are inconsistent—Duncan stands convicted of two inconsistent forms of homicide. We have no way of knowing how the jury would have found had it been properly instructed. We must therefore reverse all three of Duncan's convictions and remand this case for a new trial.

### I. *Shooting at the Peppermint Lounge*

{¶ 3} On the evening of December 21, 2000, Raciel "Chubby" Baldwin went to the Peppermint Lounge in Lincoln Heights with his girlfriend, Glenys Cantrell, Cantrell's friend, Regina McFinley, and McFinley's boyfriend, Jermaine Broach, to celebrate McFinley's birthday.

{¶ 4} Cantrell testified that while they were in the Peppermint Lounge, Baldwin became agitated. Baldwin took his jacket and watch off and walked over to the other side of the bar to confront a man named Derrick "Dirty" Minor.

{¶ 5} The state introduced evidence suggesting that there was "bad blood" between Baldwin and Minor. About eight months before the incident at the Peppermint Lounge, Baldwin had filed a complaint with the police stating that Minor had hit him in the mouth and fired two guns at him. Minor had been indicted on a charge of felonious assault, but the charge was dismissed for want of prosecution.

{¶ 6} According to James Clark, a patron in the Peppermint Lounge that evening, Baldwin and several friends attacked Minor and his friend Duncan (nicknamed "Ball"). Clark testified that Baldwin and his friends grabbed Minor first and were "getting him pretty good," with Minor unable to do anything. Clark testified that Duncan was also attacked, with several men holding Duncan and several men punching him.

{¶ 7} Cantrell testified that after the fight, a number of people took Minor out the front door of the lounge. Cantrell found Baldwin, who was still inside the lounge, demanded that they leave, and began pulling Baldwin toward the back door. McFinley testified that she helped Cantrell push Baldwin, who was still "ranting and raving," toward the back door, and that it took them about three or four minutes to get out of the lounge. The back door of the lounge led into a well-lighted parking lot, where both Cantrell and McFinley had parked their vehicles earlier in the evening.

{¶ 8} Cantrell testified that as they stepped out the back door and into the parking lot they saw that to their left were several men standing near a car, one of them waving a gun. Baldwin and the men began exchanging words. Cantrell remembered the men saying "that's him" and "we're going to get him." She testified that Baldwin said that he was not afraid to die. McFinley testified that Baldwin was arguing and screaming, "I'm not scared of nobody, I'm not scared of no bullets," and challenging the men to put the gun down and fight without it.

{¶ 9} Cantrell testified that McFinley's boyfriend, Broach, was over by the men with the gun, wrestling with them and screaming, "It ain't worth it, it ain't worth it."

{¶ 10} Cantrell testified that she pulled Baldwin across the parking lot and toward the safety of their van. As she tried to get her key in the door of the van, she heard a gunshot. She saw Baldwin twitch and then collapse on the ground. Dr. Daniel Lawrence, a deputy coroner for Hamilton County, later testified that Baldwin had died from a gunshot wound to his head that penetrated his skull and brain, a wound that Baldwin would not have survived even with immediate medical attention.

{¶ 11} Likewise, McFinley testified that she and Cantrell had struggled to get Baldwin across the parking lot and to the van. She testified that as she stood by the van with Baldwin, urging him to get in, she looked back at the men and saw one of them pull a gun out of his pocket. She turned back to Baldwin and said, "Chubby, get in the van before they start shooting." As soon as she spoke, she heard about six gunshots. When the shooting stopped, she heard Cantrell screaming and crying and saw Baldwin lying on the ground.

{¶ 12} Clark testified that after the fight inside the lounge had ended, he followed some of the crowd out the back door and into the parking lot. To his left he saw the men whom Baldwin attacked in the bar—Minor and Duncan. The men were visibly upset, and Broach was trying to calm them down. Clark testified that Baldwin had several people trying to pull him back to his vehicle but that Baldwin continued to yell at Minor and Duncan that he was not scared of a gun. Clark testified that Duncan held up a gun and fired six or seven shots in rapid succession and that Baldwin fell on the ground. According to Clark, Minor and Duncan quietly and calmly got in their car and drove away.

{¶ 13} Cantrell and McFinley both testified that after going to the hospital and learning that Baldwin had died, they went to the Lincoln Heights police station and each gave a description of the shooter. Several weeks later, both Cantrell and McFinley independently picked Duncan out of a photo array as the man who had shot Baldwin. At trial, both identified Duncan as the shooter outside the Peppermint Lounge.

{¶ 14} In addition to the three eyewitnesses who testified that Duncan had shot Baldwin, the state offered the testimony of James Krueger. Krueger was an inmate in the Hamilton County Justice Center along with Duncan for about three weeks after Duncan was arrested in connection with Baldwin's death.

{¶ 15} Krueger testified that he and Duncan had discussed Duncan's case on many occasions. Krueger testified that Duncan had told him that while at the Peppermint Lounge, Duncan's friend was "jumped" and that the friend received a bloody lip and got a tooth knocked out. According to Krueger, Duncan said that he was enraged and "went outside towards closing time, waited in a vehicle, waited for this person to come out, and shot him in the head." Krueger also testified that Duncan had said that he planned on using a false alibi defense in his

trial and that he was going to get his brother, sister-in-law, and mother to testify that he was babysitting on the night of the shooting. On cross-examination, Krueger admitted that prior to meeting Duncan, he had once been an informant for the state while incarcerated.

{¶ 16} The defense offered the testimony of Willie Ray Jones, who was incarcerated with Krueger and Duncan. Jones testified that Krueger had approached him about becoming an informant in the state's case against Duncan, saying that it had worked for him in the past to gain consideration and that it could help Jones too. Krueger showed Jones notes that he had been making of his conversations with Duncan, but, according to Jones, the notes were not accurate, and Jones decided not to get involved.

{¶ 17} Duncan's uncle, Paul Bean, called as a witness *by the court*, testified that a month or two after the incident at the Peppermint Lounge, his sister, Duncan's mother, called him and expressed concern about Duncan's activities and wanted Bean's help in turning him in to the police.

{¶ 18} Bean knew a Cincinnati police officer, Eric Dunn, so he contacted Dunn and asked for Dunn's help in turning in his nephew. Bean denied telling Dunn that Duncan's mother had told him that Duncan had told her that he had been involved in a shooting in Lincoln Heights. Bean denied ever mentioning a homicide in Lincoln Heights to Officer Dunn, denied ever talking personally to his nephew, and asserted that all of his knowledge concerning Duncan came only from Duncan's mother.

{¶ 19} Bean stated that he had testified at Duncan's grand-jury hearing, after spending one day in jail for refusing to testify. Bean claimed that he did not remember his specific testimony at the grand-jury hearing.

{¶ 20} To refresh his memory, the state read to Bean his previous testimony at the grand-jury hearing. The state read, "The question—the first question was: 'But did he'—that being Thomas—'did he tell you something?'" The state then read Bean's response: "No, Thomas didn't tell me nothing." After further prompting at the grand-jury hearing, Bean changed his answer to the question, "[D]id [Thomas] tell you something?" stating, "That he was there." The state at the grand-jury hearing then asked Bean, "So he told you, your nephew Thomas, who also goes by Ball, told you that he was there when this murder happened?" Bean responded, "No, he told me he was up there and the guys were Dirty—." After hearing his grand-jury testimony read to him, Bean continued to claim that he did not remember making the statements.

{¶ 21} The state then offered the testimony of Officer Dunn. Dunn testified that Bean had called him and asked to speak with him. At their meeting, Bean told Dunn that he had some information about the shooting in "the Heights," and

that his nephew, Ball, was involved in a shooting at the Peppermint Lounge. According to Dunn, Bean expressed concern for his nephew. Dunn testified, "His concern was that his nephew was running with the wrong crowd, that he was concerned that if he didn't turn his nephew into someone like myself, that his nephew would end up being hurt or killed, because of the situation at the Peppermint Lounge."

{¶ 22} The defense objected to the admissibility of Dunn's testimony. After the state's questioning of Dunn and before cross-examination, the court stated the following: "The Court is going to give the jury a cautionary instruction at this time. The testimony of Officer Dunn has not been given for the truth of the matter asserted, but only to show and explain his subsequent investigative activities with regard to the information which he received."

{¶ 23} Finally, in his defense, Duncan offered the testimony of his brother, Curtis Duncan, his brother's girlfriend, Lolita Harris, and his mother, Ellen Duncan. All three testified that Duncan had babysat for his brother and his girlfriend's children on the night of the shooting at the Peppermint Lounge. Duncan himself testified that he was babysitting that night. Also in his testimony, Duncan denied that he was a friend of Minor and stated that he never went to bars.

## II. Erroneous Jury Instructions

{¶ 24} In his first assignment of error, Duncan argues that the trial court erred by convicting and sentencing him for murder after the jury had found him guilty of voluntary manslaughter for the same killing. Duncan is correct. A person cannot be convicted of both murder and voluntary manslaughter for the same killing. The state concedes this error. The more difficult question is what the remedy should be.

{¶ 25} Duncan was indicted for three separate crimes arising from the death of Baldwin: murder, felony murder, and voluntary manslaughter. Murder occurs when a person purposely causes the death of another, while felony murder occurs when a person causes the death of another as a proximate result of committing or attempting to commit a violent felony of the first or second degree.[1] Voluntary manslaughter occurs when a person knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force."[2]

---

1. R.C. 2903.02(A) and (B).

2. R.C. 2903.03(A).

{¶ 26} A particular offense can have various lesser offenses associated with it. The Ohio Supreme Court has articulated the distinction between an inferior-degree offense and a lesser-included offense. "[A]n offense is an 'inferior degree' of the indicted offense where its elements are *identical* to or contained within the indicted offense, except for one or more additional mitigating elements which will generally be presented in the defendant's case."[3]  In contrast, "[a]n offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."[4]

{¶ 27} From a comparison of the statutory definitions of murder and voluntary manslaughter, it is clear that voluntary manslaughter is an offense of inferior degree to murder, and not a lesser-included offense of murder.[5]  The Ohio Supreme Court has held that "[v]oluntary manslaughter is, by our prior definition, an inferior degree of murder."[6]  The court has also held that, under the voluntary-manslaughter statute, "the jury must find a defendant guilty of voluntary manslaughter rather than murder if the prosecution has proven, beyond a reasonable doubt, that the defendant knowingly caused the victim's death, and if the defendant has established by a preponderance of the evidence the existence of one or both of the mitigating circumstances."[7]

{¶ 28} Despite this clear declaration from the Ohio Supreme Court that a jury cannot find a defendant guilty of both murder and voluntary manslaughter, the transcript of Duncan's trial reveals that the trial court, as well as both the prosecutor and the defense, from voir dire through sentencing, mistakenly believed that the jury could return guilty verdicts on all three charges.  In its jury instructions, the court stated, "The charges set forth in each count of the indictment constitute a separate and distinct matter.  You must consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count. The defendant may be found guilty or not guilty of any one or all of the offenses

---

3.  See *State v. Deem* (1988), 40 Ohio St.3d 205, 209, 533 N.E.2d 294.

4.  Id., paragraph three of the syllabus.

5.  See, also, *State v. Rhodes* (1992), 63 Ohio St.3d 613, 617, 590 N.E.2d 261;  *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576.

6.  See *State v. Rhodes*, supra, 63 Ohio St.3d at 617, 590 N.E.2d 261.

7.  See *State v. Rhodes*, supra.  See, also, *State v. Wallace* (Dec. 31, 1996), 1st Dist. No. C–950465, 1996 WL 741981.

that are charged." That is a proper charge in some circumstances, but not in this case.

{¶ 29} Had the jury been properly instructed, it would have been told that Duncan could be convicted *either* of murder or voluntary manslaughter. The Ohio Jury Instructions recommend that a jury be told that if it finds that a defendant has committed murder but also finds that the defendant acted while under the influence of sudden passion or in a sudden fit of rage provoked by the victim, "then you must find the defendant not guilty of murder and guilty of voluntary manslaughter."[8] That instruction should have been given in this case.

{¶ 30} Because the jury found Duncan guilty of voluntary manslaughter, it apparently believed that Duncan had knowingly caused the death of Baldwin but also that Duncan was either under the influence of sudden passion or in a sudden fit of rage provoked by Baldwin. Having found that the mitigating circumstance of provocation existed, the jury should not have found Duncan guilty of murder. Therefore, it was clear error that Duncan was convicted and sentenced for both murder and voluntary manslaughter.

{¶ 31} Though the defense did not object to the jury instructions during the trial, the state concedes that the erroneous instruction was plain error. The state also agrees that the error was prejudicial to Duncan, requiring a reversal of his convictions and a new trial. The question then becomes what should be at issue in a new trial.

{¶ 32} The state argues that Duncan should receive a new trial, once again facing all three charges. Duncan argues that he should receive a new trial on only the voluntary-manslaughter charge because the jury made a finding of fact that the voluntary-manslaughter mitigating circumstance existed.

{¶ 33} While Duncan asserts that the state cannot retry him on the murder charge, he makes no supporting legal argument and cites no cases in his brief. In oral argument, his attorney said that to allow a new trial on all three charges would allow the state "another bite at the apple." We interpret this to mean that Duncan believes that double jeopardy or collateral estoppel bars his retrial on the murder charge, and we will analyze the issue accordingly.

### III. Double Jeopardy

■ {¶ 34} Double jeopardy is prohibited by the Fifth Amendment to the United States Constitution. It states, "No person shall * * * be subject for the

---

8. 4 Ohio Jury Instructions (2002), Section 503.02, at 156.

same offence to be twice put in jeopardy of life or limb."  Double jeopardy has been made applicable to the states through the Fourteenth Amendment.[9]

{¶ 35} Double jeopardy provides three separate protections for criminal defendants.  It protects against a second prosecution for the same offense after an acquittal, against prosecution for the same offense after a conviction, and against multiple punishments for the same offense.[10]

{¶ 36} But double jeopardy is not an absolute bar to successive trials. The general rule is that a person can be tried a second time for an offense when his prior conviction for that same offense has been set aside in his appeal.[11]  This concept rests on the notion "that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean."[12]  In addition, in such cases, society's interest in punishing criminals outweighs the defendant's interest in avoiding further prosecution.[13]

{¶ 37} But there is one exception to the rule that permits retrial after a defendant's successful appeal.  It is that double jeopardy bars a retrial when a conviction is reversed due to insufficient evidence presented at the first trial.[14] The reasoning is that the appellate court's reversal of a conviction for insufficient evidence is the functional equivalent of a verdict of acquittal and thus bars reprosecution for the same offense.[15]  In such a case, the government had a fair opportunity but failed to develop a case that warranted submission to a jury.[16]

{¶ 38} But the general rule remains that when the defendant's conviction has been set aside because of an *error in the proceedings* leading to the conviction, double jeopardy does not bar a retrial.[17]  In making the exception to the rule, the Supreme Court noted, "[R]eversal for trial error, as distinguished from evidentia-

---

9.  See *Benton v. Maryland* (1969), 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707.

10.  See *Justices of Boston Mun. Court v. Lydon* (1984), 466 U.S. 294, 306–307, 104 S.Ct. 1805, 80 L.Ed.2d 311.

11.  Id.;  *United States v. Ball* (1896), 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300;  *Forman v. United States* (1960), 361 U.S. 416, 425, 80 S.Ct. 481, 4 L.Ed.2d 412.

12.  See *North Carolina v. Pearce* (1969), 395 U.S. 711, 721, 89 S.Ct. 2072, 23 L.Ed.2d 656.

13.  See *United States v. Tateo* (1964), 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448.

14.  See *Burks v. United States* (1978), 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1.

15.  Id. See, also, *United States v. Miller* (C.A.5, 1992), 952 F.2d 866, 871.

16.  Id.

17.  See *United States v. Tateo,* supra, 377 U.S. at 465, 84 S.Ct. 1587, 12 L.Ed.2d 448.

ry insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, *incorrect instructions*, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished."[18] (Emphasis added.)

{¶ 39} In *Forman v. United States*,[19] the defendant was convicted for conspiring to evade income taxes. After his conviction, but before his appeal, the Supreme Court issued a decision that rendered the jury instructions in Forman's original trial defective. The appellate court reversed Forman's conviction and remanded the case with instructions to enter a judgment of acquittal. On rehearing, the appellate court modified its original order for acquittal and entered one directing a new trial. The Supreme Court upheld the appellate court's order for a new trial, ruling that Foreman was not put in double jeopardy. The Supreme Court held that the appellate court did not lose its power to amend its decision on rehearing and that it could order a new trial because of an improper instruction with no violation of double jeopardy.[20]

{¶ 40} Similarly, in *United States v. Miller*,[21] the defendants' convictions were reversed on appeal due to an intervening Supreme Court decision rendering the indictment and the jury instructions invalid. The defendants sought dismissal of the new indictment on double-jeopardy grounds. Citing *Forman* and other Supreme Court decisions holding that reversals based on "mere trial errors" do not invoke the principles of double jeopardy, the Fifth Circuit Court of Appeals held that double jeopardy did not bar a retrial.[22] The court stated, "Since reversal is based on defects in the indictment and jury instructions rather than on insufficiency of the evidence, there is no apparent obstacle to retrial."[23]

{¶ 41} There are numerous other instances of courts reversing a conviction due to trial error and remanding for a retrial, despite the defendant's claim that a

---

18. See *Burks v. United States*, supra, 437 U.S. at 15, 98 S.Ct. 2141, 57 L.Ed.2d 1.

19. See *Forman v. United States* (1960), 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412.

20. Id. at 426, 80 S.Ct. 481, 4 L.Ed.2d 412.

21. See *United States v. Miller* (C.A.5, 1992), 952 F.2d 866.

22. Id. at 871.

23. Id.

retrial would violate double jeopardy. For example, double jeopardy has not barred a retrial due to prosecutorial misconduct,[24] defects in the charging instrument,[25] or a confession coerced by the trial judge.[26]

{¶ 42} Turning to the particulars of Duncan's case, we note that the reason we are reversing Duncan's convictions is that the trial court gave erroneous jury instructions. Our reversal is clearly based on trial error and in no way due to insufficiency of the evidence. Therefore, we hold that it would not violate double jeopardy for the state to retry Duncan for murder in his new trial.

{¶ 43} We note one other possible exception to the rule that allows a retrial after a reversed conviction. In *Green v. United States*,[27] the Supreme Court held that when a defendant is convicted of a lesser offense included in that charged in the original indictment, he can be retried only for the offense on which he was convicted, and not for the charged offense. Similar to a reversal due to insufficient evidence, the lack of a conviction on the greater charge is an implicit acquittal, meaning that double jeopardy prevents a retrial on the greater charge.[28]

{¶ 44} But this exception does not help Duncan, because Duncan was actually *convicted* of both murder and voluntary manslaughter. Therefore, he has no ground to argue that he received an implicit acquittal on the murder charge merely because he was convicted of voluntary manslaughter. Under the instructions given by the trial court, the jury could have acquitted Duncan of murder and found him guilty of voluntary manslaughter, but it chose instead to find Duncan guilty of both.

{¶ 45} In addition, we note that the exception pertains only to a "lesser offense included in that charged." A lesser-included offense is distinguishable from an inferior-degree offense. Because voluntary manslaughter is an inferior-degree offense of murder, and not a lesser-included offense, this exception does not apply to Duncan's case. Therefore, it is proper for him to be retried for murder.

---

24. See *Hagez v. Maryland* (2000), 131 Md.App. 402, 749 A.2d 206.

25. See *Montana v. Hall* (1987), 481 U.S. 400, 107 S.Ct. 1825, 95 L.Ed.2d 354; *United States v. Ball,* supra.

26. See *United States v. Tateo,* supra.

27. *Green v. United States* (1957), 355 U.S. 184, 190–191, 78 S.Ct. 221, 2 L.Ed.2d 199. See, also, *United States v. Tateo,* supra, 377 U.S. at 465, 84 S.Ct. 1587, 12 L.Ed.2d 448.

28. See *Green v. United States,* supra, 355 U.S. at 190–191, 78 S.Ct. 221, 2 L.Ed.2d 199.

{¶ 46} We have determined that the prohibition against double jeopardy fails to prevent the state from retrying Duncan for murder. If Duncan is also arguing that collateral estoppel bars his retrial for murder, that argument also fails.

## IV. Collateral Estoppel

{¶ 47} Collateral estoppel is the doctrine that recognizes that a determination of facts litigated between two parties in a proceeding is binding on those parties in all future proceedings.[29] Collateral estoppel " 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' "[30]

{¶ 48} Duncan's argument is that the jury made a finding of fact that the mitigating factor existed—that Baldwin had provoked Duncan to act under the influence of sudden passion or in a sudden fit of rage with deadly force. Under this argument, as an issue of ultimate fact litigated between the state and Duncan, the issue of provocation could not be relitigated. Duncan argues that if the issue of provocation could not be relitigated because it had already been found to exist, Duncan cannot be convicted of murder and, therefore, cannot be retried for murder.

{¶ 49} The problem with this argument is that because we are reversing Duncan's convictions, none of the findings of fact in the previous trial can be considered valid or final. Due to the erroneous instructions, we must consider the entire jury verdict—including the finding of fact that Duncan acted either under the influence of sudden passion or in a fit of rage provoked by Baldwin—as tainted. In the interest of justice, Duncan will receive an entirely new trial. Duncan cannot pick and choose which findings or rulings from the prior trial he would like to carry over to the next. All previous findings are invalidated, and both parties must start from scratch. Therefore, collateral estoppel does not bar Duncan's retrial for murder.

{¶ 50} Accordingly, we sustain Duncan's first assignment of error but hold that Duncan can be retried on the same three charges—murder, felony murder, and voluntary manslaughter.

## V. Motion to Suppress

{¶ 51} In his second assignment of error, Duncan argues that the trial court erred when it overruled his motion to suppress the identification testimony

---

29. See *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 443, 683 N.E.2d 1112.

30. Id., quoting *Ashe v. Swenson* (1970), 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469.

of McFinley. Duncan moved before the trial to suppress the identification testimony of Cantrell, McFinley, and Broach. The trial court sustained the motion for Broach but denied the motion for Cantrell and McFinley.

{¶ 52} At the suppression hearing, Lincoln Heights Police Officer Sandy Stevenson testified that she was the officer assigned to investigate the killing of Baldwin at the Peppermint Lounge. She explained that several days after the shooting, at the Lincoln Heights police station, she showed a photo array of six individuals, including Duncan, to Broach. She testified that Broach did not say anything and that Broach did not identity Duncan as the shooter. Stevenson testified that after Broach did not identify anyone as the shooter, she pointed to Duncan's photo and said, "[W]ell, this is the guy right here." Broach then agreed that Duncan was the one, saying, "I just wasn't sure, but yeah, that's him."

{¶ 53} Stevenson testified that McFinley was in the room with Broach when he was shown the photo array. Stevenson said that after she pointed to Duncan's photo and indicated that Duncan was the suspect and after Broach identified Duncan, McFinley also identified Duncan as the shooter. Stevenson also testified that on a separate occasion, she had Cantrell view the photo array and Cantrell identified Duncan as the shooter.

{¶ 54} McFinley testified that the morning after the shooting, she and Broach went to the Lincoln Heights police station, where she and Broach were interviewed by the police. Both Broach and McFinley were in the interview room together. She testified, though, that on a different day, within the week, she was shown a photo array by Officer Stevenson. She testified that Broach was not in the room when she viewed the photo array and that she identified Duncan as the shooter at the Peppermint Lounge. She stated that Officer Stevenson did not say anything to her prior to her identification of Duncan as the shooter. She also testified that she was not in the room when Broach identified Duncan as the shooter.

{¶ 55} Broach testified that he identified Duncan as the shooter only after Officer Stevenson said, "[T]his is the guy." Broach stated at the hearing, "All the other witnesses said yes, then that must be him." Broach also testified that McFinley was present with him when he was shown the photo array.

{¶ 56} When a witness has been confronted with a suspect before trial, due process requires a court to suppress the witness's identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances.[31] "In a hearing

---

**31.** See *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819, citing *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, and *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.

on a motion to suppress, the trial court assumes the role of the trier of fact, and determines the credibility of the witnesses and weighs the evidence presented at the hearing. A reviewing court must accept the trial court's findings of fact if they are supported by competent, credible evidence; but, the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standards."[32]

{¶ 57} At the suppression hearing, concerning Broach, the trial court stated, "He's out. He's out. I am not even—everything he says shows that he was contaminated. He even says he made identification based on what other witnesses told him." But concerning McFinley, the court stated, "I believe the witness. I don't believe that happened the way the police officer said, or the other witness. She was very articulate about what happened. So, Broach is out, the other two are in."

{¶ 58} We conclude that there is competent and credible evidence in the record to support the trial court's finding of fact that McFinley's identification testimony was not tainted by suggestion. Given that finding of fact, the trial court properly allowed McFinley to testify at trial concerning her identification of Duncan as the shooter.

{¶ 59} Therefore, we overrule Duncan's second assignment of error.

## VI. Hearsay

{¶ 60} In his third assignment of error, Duncan argues that the trial court erred by allowing the state to present the testimony of Bean and Officer Dunn. Duncan contends that the testimony of both witnesses was hearsay yet was admitted to prove the "fact" that Duncan was involved in the shooting at the Peppermint Lounge.

{¶ 61} Bean's testimony, which related the contents of a conversation Bean had had with his sister, Duncan's mother, was hearsay. According to Bean, Duncan's mother was concerned about Duncan and wanted Bean's help in turning Duncan in to the police. Bean testified that although she mentioned concerns about possible misbehavior by Duncan, she did not allude to Duncan's involvement in a shooting in Lincoln Heights. The testimony about Bean's conversation with Duncan's mother was clearly inadmissible hearsay.

---

32. See *State v. Hollins* (Mar. 30, 2001), 1st Dist. No. C–000344, 2001 WL 303247, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972; *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583; *State v. Warren* (1998), 129 Ohio App.3d 598, 601, 718 N.E.2d 936; *State v. Curry* (1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172; *State v. Claytor* (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906.

{¶ 62} The state went even further and, in an attempt to impeach Bean, read into the record some of Bean's prior testimony from the grand-jury hearing. Bean's testimony about his previous grand-jury testimony, and the grand-jury testimony itself, was convoluted, and Bean equivocated considerably. Nonetheless, Bean's testimony at trial regarding his grand-jury testimony was also hearsay, because it concerned conversations with Duncan's mother, or with Duncan himself, that were not necessarily related to the incident at issue.

{¶ 63} The state argues that it is irrelevant that Bean's testimony about his grand-jury testimony was hearsay because it was offered only to impeach Bean, not for the truth of the matter. This is a dubious argument. Impeach what? It is not clear what the state would have gained by impeaching Bean. Bean's testimony—all hearsay in any event—only stated that Duncan's mother expressed concern about Duncan's activities and, knowing that Duncan was wanted by the police, sought Bean's help in getting Duncan safely turned in to the police. Why would the state want to impeach that?

{¶ 64} It is much more likely that the state, rather than impeaching Bean's credibility, wanted to introduce Bean's grand-jury testimony for the truth of the matter, which, at best for the state, might have indicated that Bean had indeed talked to Duncan and that Duncan had admitted being someplace with Derrick Minor. It is the old trick of attempting to prove a positive by impeaching a negative. Neither logic nor law permits this sleight-of-hand. The trial court not only allowed "impeaching" of already improper hearsay with more double hearsay, it facilitated this fiasco by calling Bean as the court's witness—thus allowing "impeachment" by the state. We conclude that Bean's testimony involved statements made by others, offered for the truth of the matter of those statements, and was not offered for impeachment purposes. Therefore, the trial court erred in allowing Bean's testimony.

{¶ 65} Officer Dunn's testimony was also hearsay. In fact, it was double hearsay. According to Dunn, Duncan told Bean that he had been involved in a shooting in Lincoln Heights and then Bean told Dunn. Though Bean insisted that all his information came from Duncan's mother (which would have made Dunn's testimony *triple* hearsay), Dunn testified that Bean told him he got his information from Duncan himself.

{¶ 66} It is true that a witness may sometimes testify to explain the subsequent investigative activities of the witness, and that such testimony is not offered for the truth of the matter.[33] But it is a very narrow exception to the hearsay and relevance rules—except seemingly in Hamilton County.[34] The trial

---

33. See *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401.

34. See *State v. Gonzalez*, 154 Ohio App.3d 9, 2003-Ohio-4421, 796 N.E.2d 12.

court here did give a cautionary instruction to the jury stating that it should not consider the truth of what Dunn claimed Duncan said, but should only consider how it explained Dunn's subsequent investigative activities.

{¶ 67} Dunn testified to his subsequent investigative activities. He said that he did not take any notes of his conversation with Bean. He testified that once he realized that the homicide did not happen within the city of Cincinnati, his jurisdiction, but in Lincoln Heights, he simply passed on the information to the Lincoln Heights Police Department. Dunn also sent a Cincinnati police officer to an apartment building in Cincinnati where Bean said Duncan might have been staying, but Duncan was not there. Dunn also testified that when he talked to the Lincoln Heights police, they already had Duncan's name as a suspect.

{¶ 68} Officer Dunn's subsequent investigative activities were hardly relevant or essential evidence in this trial. Officer Dunn had nothing to do with this homicide investigation—it was not even in his jurisdiction—and his only relation at all to the case was his conversation with Bean. Dunn's testimony concerning his subsequent actions reveals the thinly disguised attempt by the state to offer Dunn's testimony for the truth of the matter of Duncan's (or Duncan's mother's) statement to Bean. It is disingenuous to assert that Dunn's testimony was offered for any reason other than to prove the "fact" that Duncan was involved in a shooting in Lincoln Heights. Therefore, the trial court erred in allowing Dunn to testify concerning his conversation with Bean.

{¶ 69} Because of our ruling on Duncan's first assignment of error, there is no need to determine whether the trial court's error in admitting the hearsay testimony of Bean and Dunn was harmless or reversible error. Either way, in Duncan's next trial, that testimony will be inadmissible.

{¶ 70} Duncan also argues that the trial contained numerous instances of prosecutorial misconduct, including misstatements of testimony and mischaracterizations of the evidence. Because we are reversing Duncan's convictions and remanding his case for a new trial, Duncan's allegations in this respect are moot.

### VII.   Sufficiency and Manifest Weight

{¶ 71} In his fourth, fifth, and sixth assignments of error, Duncan argues that there was insufficient evidence to convict him of all three charges, that his convictions were against the manifest weight of the evidence, and that the trial court erred by denying his Crim.R. 29 motion for acquittal.

{¶ 72} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[35] A challenge to the sufficiency of the

---

35.  See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[36] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt.[37]

{¶ 73} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[38] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[39] The discretionary power to reverse should be invoked only in exceptional cases "[where] the evidence weighs heavily against the conviction."[40]

{¶ 74} The state presented testimony that Baldwin and his friends attacked Duncan and Minor. Three witnesses testified that after the fight, while they were in the parking lot, Baldwin continued to challenge Duncan to fight, and Duncan shot Baldwin. The state also offered evidence from a jailhouse informant that Duncan had admitted that after being attacked by someone, he waited for the person to come out of the building and shot him in the head, and that he planned on offering an alibi defense that he was babysitting for his brother on the night of the shooting.

{¶ 75} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that there was substantial and credible evidence to prove all essential elements of the crimes and to support the jury's verdicts. Of course, if the jury had been properly instructed, it would not have been able to find Duncan guilty on all three charges. But for purposes of judging the sufficiency of the evidence presented by the state, we conclude that the evidence presented was legally sufficient to sustain Duncan's convictions. We also conclude that Duncan's convictions were not against the manifest weight of the evidence.

---

36. Id.

37. See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

38. See *State v. Thompkins,* supra, 78 Ohio St.3d at 387, 678 N.E.2d 541.

39. See id.; *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

40. See *State v. Martin,* supra.

{¶ 76} Therefore, we overrule Duncan's fourth, fifth, and sixth assignments of error.

## VIII.  Batson Challenge

{¶ 77} In his seventh and final assignment of error, Duncan argues that the trial court erred when it overruled his challenge to the state's use of a peremptory challenge to excuse an African–American juror.  Because we are reversing Duncan's convictions and remanding this case for a new trial, this assignment of error is moot, and we do not need to address it.

{¶ 78} Accordingly, we sustain Duncan's first and third assignments of error, reverse his convictions, and remand his case for a new trial.

Judgment reversed
and cause remanded.

DOAN, P.J., and HILDEBRANDT, J., concur.