The STATE of Ohio, Appellee,

v.

JORDAN, Appellant.

[Cite as *State v. Jordan,* 167 Ohio App.3d 157, 2006-Ohio-2759.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040897.

Decided June 2, 2006.

158

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, for appellee.

H. Fred Hoefle, for appellant.

SUNDERMANN, Judge.

{¶ 1} Defendant-appellant, Timothy L. Jordan Jr., appeals his conviction, following a jury trial, for the aggravated murder of RaeMone Williams. Jordan raises six assignments of error on appeal. Because we find none of the assignments meritorious, we affirm the judgment of the trial court.

## I. Facts

{¶ 2} In the early morning hours of April 22, 2004, RaeMone Williams was standing among a group of people outside the Parktown Café when he was shot to death. Finnis Bonner, a Cincinnati police officer, was providing off-duty security for the Parktown Café that morning. The café had just closed, and people were congregating in the street, when Bonner heard a single gunshot followed by a flurry of other gunshots. When the gunfire stopped, Bonner saw a man lying in the street. As he approached the man, several people began yelling that the shooter was leaving the scene in a blue Chevrolet. Bonner saw the vehicle, which was carrying at least two black men, leave the area, so he put out a radio broadcast. Shortly thereafter, police located the vehicle at Good Samaritan Hospital.

{¶ 3} Around this time, the hospital's security staff notified police that two black men had just entered the hospital's emergency room, one of whom had been shot in the shoulder. The police subsequently identified the two men as Jordan and his brother, Jermaine Higgins. They also found two other men, later identified as Jordan's cousin, Clarence ("Corny") Higgins, and his friend Jason Raven walking outside the hospital near the emergency-room entrance.

{¶ 4} Jermaine, Clarence, and Jason were taken to police headquarters for questioning. Later that morning, after Jordan had been treated and released from the hospital, he was transported to police headquarters for questioning. When Jordan arrived at the station, he was wearing a hospital gown, blue-jean shorts, and gym shoes and was holding a blue and white baseball cap.

{¶ 5} In the meantime, the police had begun collecting evidence and interviewing witnesses at the scene. One of those witnesses, Petrina White, was leaving the police station when she saw a man whose clothing matched the clothing she had seen the shooter wearing earlier that morning. When Petrina got home, she called police, gave them a description of the person she had seen, and informed

them that this person was the shooter. Her description of that person's clothing was consistent with Jordan's clothing.

{¶ 6} Later that morning, the police interviewed Jordan, Jermaine, Clarence, and Jason. The men told police that they had picked up Jordan at his sister's apartment the previous evening and then driven to Martin's Bar, where they stayed for several hours. After leaving Martin's Bar, they drove to the Parktown Café, which had just closed. A crowd of people had formed in the street near the café and the parking lot of Amir's Market, a nearby grocery store. Jermaine had parked the car near the grocery store's parking lot, and the four men had gotten out of the car and gone their separate ways.

{¶ 7} Jermaine told police that he had been talking with Qianna Ginyard when he heard gunshots, turned around, and saw Jordan shoot RaeMone. He said that RaeMone fell to the ground after three shots. Jermaine then saw another man run up and shoot Jordan in the shoulder. Jermaine and Jordan then ran back to the car, and Jermaine drove Jordan to the hospital.

{¶ 8} Clarence told police that Jordan had been carrying a black semiautomatic weapon on the night of the murder. Clarence was talking to a group of people when he heard gunshots. He then heard Jermaine yelling that Jordan had been shot. Clarence told police that he, Jordan, Jermaine, and Jason then ran to the car. Clarence got into the front passenger seat, and Jason got into the back seat with Jordan. They then drove to Good Samaritan Hospital. As they were driving into the rear entrance of the hospital, Clarence and Jason got out of the car. Jason took Jordan's coat, wrapped the gun in it, and hid it in a wooded area near the hospital. Later that day, Clarence showed police where the coat and gun were hidden.

{¶ 9} Jason told police that he was talking to a girl in the parking lot when he heard gunshots and women screaming and then saw a man running from the corner, shooting backwards. Jason hit the ground and started crawling to the car. When he looked up, he saw Clarence, Jermaine, and Jordan running to the car. Jason told police that when Jordan got in the car, he said something like, "Yeah, I got that nigga. He didn't have shit, though." Jason understood this to mean that Jordan had robbed someone. Jordan then told the group that he had been shot and needed to go to the hospital. On the way into the hospital's driveway, Jermaine stopped the car. Jordan told Jason to grab the gun and coat and to get rid of them. Jason took the gun, wrapped the coat around it, and got out of the car with Clarence. He and Clarence then threw the gun into the woods.

{¶ 10} Jordan was also interviewed by police. After signing a written waiver of his *Miranda* rights, Jordan gave two separate statements to police. In the first statement, Jordan told police that he was urinating in an alley when he

heard gunshots. He was then hit in the shoulder by a bullet and blacked out. In a second statement, which the police recorded, Jordan said that he was carrying a .38–caliber revolver on the night that RaeMone was killed because he was afraid for his life. He owed the leader of a local gang $3,500 for a drug transaction, but he had refused to pay the money, so the gang leader had made arrangements to kill him. Jordan said he was standing at the intersection of Linn and Findlay Streets near Amir's Market with Jermaine, Clarence, and Jason when he crossed the street to urinate in the alley. As he was coming back across the street, he heard gunshots and saw Jason and a man in a brown and cream-colored sweat suit shooting at each other. Jordan ran over and started shooting his gun, a chrome .38–caliber revolver. Jordan denied shooting anyone, claiming instead that he was being fired upon. After he had been shot, a friend named Anthony helped him to the car, took his revolver, and then ran from the scene. Jordan could not recall, given his injury, what had happened in the car on the way to the hospital.

{¶ 11} Jordan was subsequently charged with the aggravated murder of RaeMone Williams. He pleaded not guilty, and the case proceeded to trial. During the trial, the state presented testimony from a number of witnesses, including three women, Petrina White, Celeste Staley, and Qianna Ginyard, who were among the crowd of people outside the Parktown Café on the morning of the shooting.

{¶ 12} Petrina testified that she was sitting in a parked car in the parking lot of the grocery store next to the Parktown Café when she saw a man who was wearing a blue hat, white t-shirt, black jacket, and jeans shorts point a gun at Williams and shoot him. After Williams had fallen to the ground, Petrina saw the man reach into Williams's pants pocket. Petrina then saw the shooter and three other men run to a car and flee from the scene. That same day, Petrina called police and told them that she had seen the shooter at the police station while she was there giving a statement. She told police that the shooter had been wearing a blue baseball hat, long shorts, and a hospital gown.

{¶ 13} Celeste Staley testified that she was standing at the corner of Findlay and Linn streets and talking to RaeMone when Jordan came up to RaeMone and said, "Nigga, you know what it is." Celeste testified that that meant the person was getting robbed. Jordan then pulled a gun from his waist and pointed it at RaeMone's chest, shooting him. RaeMone fell to the ground, and Celeste heard more gunshots. As she was running to her cousin's car, Celeste saw Jordan run to a blue car, which sped away from the scene. One day after the shooting, Celeste identified Jordan from a photo array. She testified at trial that she was absolutely certain that Jordan was the shooter that night.

{¶ 14} Qianna Ginyard testified that she was standing at the corner of Findlay and Linn Streets and talking with Jermaine when she turned around and saw Jordan standing nearby. Shortly thereafter, she heard Jordan say to RaeMone, "Let me get that chain." When RaeMone gave Jordan a strange look, Jordan shot him in the chest. RaeMone then fell face down into the street. Jordan started running, and multiple gun shots rang out. Qianna did not see where Jordan ran because she was running, too. She testified that Jermaine also had a gun that night, but that he could not get it to fire. Qianna testified that she had known Jordan prior to the shooting and that she was certain that he had shot RaeMone.

{¶ 15} Raeshawn Williams testified that he had loaned his brother, RaeMone, a necklace, which RaeMone had been wearing on the day he was killed. He identified a broken necklace that police had recovered at the scene as the necklace that RaeMone had been wearing that day.

{¶ 16} Jason, Clarence, and Jermaine also testified on behalf of the state. While Jason's and Clarence's testimony was consistent with their prior statements, Jermaine's was not. Although Jermaine had earlier testified before the grand jury that he had seen Jordan shoot Williams, he recanted this testimony at trial and stated that he could not see Jordan during the shooting because the parking lot was too crowded that night. The state impeached Jermaine with his prior statement and his grand-jury testimony. Jermaine testified that his prior statement was not true and that he had made the statement under pressure from the police, who were threatening to charge him with a crime.

{¶ 17} Cincinnati Police Detective Keith Witherell investigated the death of RaeMone Williams. Witherell testified that he interviewed Jermaine, but did not pressure him into giving a statement. He escorted Jermaine to a room at the police station and asked him to write down his observations about the shooting. Witherell and his partner then left Jermaine alone in the room. Witherell, likewise, testified that he did not pressure Jermaine to testify before the grand jury.

{¶ 18} Dr. Gary Utz, a forensic pathologist and deputy coroner in the Hamilton County Coroner's office, performed the autopsy on RaeMone's body. Utz testified that RaeMone had died from a single gunshot wound to the chest, which had perforated his heart and caused blood to accumulate in his chest cavity. Utz testified that RaeMone had most likely been shot at close range, given that the bullet hole in his t-shirt had been surrounded by a ring of soot.

{¶ 19} William Schrand, the senior firearms examiner for the Hamilton County Coroner's Crime Laboratory, examined the gun, a black nine-millimeter Glock semiautomatic pistol that police had retrieved from the wooded area near the hospital, the autopsy bullet, and three groups of ammunition that police had recovered at the scene. Schrand was able to conclude that one group, which

consisted of eight cartridge casings, had been fired from the Glock semiautomatic pistol that police had recovered. A second group, consisting of four nine-millimeter cartridge cases, had been fired from another semiautomatic weapon. Schrand also examined a third group, which consisted of a single nine-millimeter bullet with conventional rifling.

{¶ 20} Schrand testified that based upon the cartridge casings found at the scene, at least two semiautomatic weapons had been fired that morning. Schrand testified that the autopsy bullet was consistent with the type and caliber of ammunition that would have been fired from a Glock, but that it had insufficient markings for him to determine to a reasonable degree of scientific certainty whether it had been fired from the Glock semiautomatic pistol that police had recovered. He did testify, however, that it was unlikely that the autopsy bullet had been fired from the other semiautomatic weapon that had been fired at the scene, because the bullet was inconsistent with the brand of ammunition that had been used for that gun.

{¶ 21} In his defense, Jordan presented testimony from his sister, Rayshaunda Higgins, and himself. Rayshaunda testified that she was residing at the Fay Apartments in April 2004 and that Jordan had been staying with her. Rayshaunda testified that Jordan had had a .38–caliber chrome revolver when he left with Jermaine, Clarence, and Jason on the night of the shooting.

{¶ 22} Jordan testified that he was carrying a .38–caliber revolver the night RaeMone was killed because he was afraid for his life. He owed the leader of a local gang $3,500 for a drug transaction, but he had refused to pay the money, so the gang leader had arranged to kill him. On the night of the shooting, Jermaine had parked the car in the parking lot of Amir's Market, which was next to the Parktown Café. He got out of the car, walked across the street, urinated in an alley, and sold two small bags of crack cocaine. As he returned across the street, he saw Jason and another man shooting at each other, so he took his pistol and fired four bullets, which were all contained in the weapon. Jordan denied shooting or robbing anyone that night, maintaining instead that he had fired his pistol only because he was being fired upon.

{¶ 23} The jury found Jordan guilty of the aggravated murder of RaeMone and the accompanying gun specifications. The trial court sentenced Jordan to life imprisonment with parole eligibility after 20 years and to three years for the merged gun specifications, to be served consecutively and prior to the murder sentence.

## II. Analysis

### Jury Issues

{¶ 24} In his first assignment of error, Jordan contends that the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution

and their counterparts in the Ohio Constitution when it overruled his objections to the prosecution's use of peremptory challenges to exclude two African–American jurors from the venire. In his second assignment of error, Jordan contends that the trial court also violated his Sixth and Fourteenth Amendment rights in failing to declare a mistrial.

{¶ 25} During voir dire, the state exercised peremptory challenges on two of the four African–American jurors in the venire. Jordan, who is also an African–American, objected and orally moved for a mistrial. Jordan subsequently filed a written motion for a mistrial. Following a midtrial evidentiary hearing, the trial court overruled Jordan's motion.

{¶ 26} Jordan contends that the state's use of criminal databases during voir dire to check the records of three of the four African–American jurors in the venire, as well as its subsequent use of peremptory challenges to exclude two of those African–American jurors, violated his Fourteenth Amendment right to equal protection, as well as his Sixth Amendment right to have a jury drawn from a fair cross-section of the community.

{¶ 27} In *Batson v. Kentucky*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination in the exercise of peremptory challenges.[1] *Batson* created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated. First, the defendant must make a prima facie showing of intentional discrimination by demonstrating that members of a cognizable racial group were peremptorily challenged and that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race.[2]

{¶ 28} Second, once the defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation for the peremptory challenge.[3] The state's explanation need not rise to the level of a "for cause" challenge; rather, it need only be based on a juror characteristic other than race and not be pretextual.[4] Third, the trial court must determine whether the prosecutor's race-neutral explanation is credible or is instead a pretext for unconstitutional discrimination.[5] "A trial court's finding of no discriminatory

---

1. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

2. Id. at 82, 106 S.Ct. 1712, 90 L.Ed.2d 69; see, also, *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140.

3. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69.

4. *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395.

5. Id. at 363, 111 S.Ct. 1859, 114 L.Ed.2d 395.

intent will not be reversed on appeal absent a determination that it is clearly erroneous." [6]

■ {¶ 29} The United States Supreme Court has likewise held that the right to a fair and impartial jury under the Sixth Amendment entitles criminal defendants to a jury drawn from a fair cross-section of the community.[7] "In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."[8] "Systematic" means caused by or inherent in the system by which juries are selected.[9]

### Peremptory Challenges

{¶ 30} The record reveals that the state exercised peremptory challenges on two African–American jurors in the venire. With respect to the first juror, Mr. Hunter, the state had collectively asked the jurors during voir dire if any of them had had any contact with police. Hunter informed the state that he had had some contact with the police, but that his contact had only been positive. When the state inquired about a 1994 criminal conviction that Hunter had listed on his juror questionnaire, Hunter replied that he had been charged with receiving stolen property, but that he had only been cited to go to court.

{¶ 31} During the lunch break, the state's attorney, suspecting that Hunter had been untruthful about his criminal contacts, checked his criminal record. She also checked the records of two other jurors, Mr. Hawthorne and Ms. Johnson, who had indicated on their jury questionnaires that they did not drive. Hawthorne and Johnson are also African–Americans.

{¶ 32} Following the lunch break, the state exercised a peremptory challenge on Hunter. Defense counsel objected, raising a *Batson* challenge to the juror's exclusion. The state explained that it had challenged Hunter because he had been untruthful about his criminal record. When defense counsel argued that the state's reason for excluding Hunter was discriminatory because Hunter had revealed his prior record, the state explained that Hunter had a more extensive

---

6. *State v. Johnson* (2000), 88 Ohio St.3d 95, 116, 723 N.E.2d 1054.

7. *Duren v. Missouri* (1979), 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579.

8. Id. at 364, 99 S.Ct. 664, 58 L.Ed.2d 579.

9. Id. at 366–367, 99 S.Ct. 664, 58 L.Ed.2d 579.

criminal history, as demonstrated by computer printouts from the Regional Crime Information Center ("RCIC") and the National Crime Information Center ("NCIC"), than he had admitted on his juror questionnaire and during voir dire. The trial court, finding the state's explanation for Hunter's exclusion to be race-neutral, overruled the *Batson* challenge.

{¶ 33} The second juror, Ms. Johnson, claimed during voir dire never to have been convicted of a crime, with the exception of a traffic ticket. When the state sought to remove her with one of its peremptory challenges, Jordan made a *Batson* challenge. During an in-chambers discussion, the trial court asked the state for a race-neutral explanation for the challenge. The state replied that it was striking Johnson because she had lied about her criminal record. The state told the court that it had also checked Johnson's record over the lunch break because Johnson had indicated on her jury questionnaire that she did not drive a motor vehicle. The state explained that it was also striking Johnson because she had been unresponsive to questions during voir dire.

{¶ 34} Following this exchange, the trial court called Johnson into chambers and questioned her about her criminal record. Johnson admitted that she had seven misdemeanor convictions, two for theft and five for passing bad checks, but maintained that she had not disclosed them because they were not recent convictions. The state pointed out, however, that the jury questionnaire did not distinguish between recent and older convictions, but simply asked whether the juror had "ever been convicted of a crime." The trial court, finding that the state had presented a race-neutral reason for Johnson's exclusion, overruled the *Batson* challenge.

### Motion for Mistrial

{¶ 35} Jordan subsequently filed a written motion for a mistrial, in which he argued that the prosecuting attorney's use of the Law Enforcement Automated Data System ("LEADS") to check the criminal records of three of the four African–American prospective jurors in the venire, as well as its decision to ultimately exclude two of those African–American jurors, violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

{¶ 36} During an evidentiary hearing on the mistrial motion, the parties stipulated that the state had checked the criminal records of three African–American jurors, juror Hunter, who it had suspected was lying about his criminal history, and jurors Hawthorne and Johnson, who had indicated on their jury questionnaires that they did not drive. The state stipulated that it had not checked the criminal record of a fourth African–American in the venire, Ms. Bagget–Bell, and that she had never made it to the jury box. The parties further stipulated that the state had not turned over the criminal records to defense

counsel during voir dire—that defense counsel had learned of the records only during the in-chambers discussions of his *Batson* challenges.

{¶ 37} An RCIC representative testified that RCIC was bound by the LEADS manual and rules and regulations and that LEADS permitted prosecuting attorneys to obtain the records of prospective jurors. Richard Goldberg, a criminal defense attorney in Hamilton County and President of the Greater Cincinnati Criminal Defense League, testified that it would have been advantageous for defense counsel to have had access to the information in these criminal databases during voir dire.

{¶ 38} At the conclusion of the hearing, the trial court overruled Jordan's motion for a mistrial. The trial court found that the state had not violated the Ohio Administrative Code or Jordan's constitutional rights by using the databases during voir dire, because it had checked the records based on suspicions it had as a result of routine inquiry during voir dire. The court also found that these suspicions were sufficient race-neutral reasons under *Batson* for it to exercise the peremptory challenges on the two African–American jurors. The trial court further found that while the state had not immediately disclosed the records, it had disclosed them to defense counsel during the *Batson* challenges.

### Discussion

 {¶ 39} With respect to Jordan's arguments relating to the state's use of the peremptory challenges, the record reveals that the state provided a race-neutral explanation for striking both Hunter and Johnson from the jury. Both jurors had been less than honest about their criminal records. Juror Hunter had denied any negative contact with the police, but actually had a very significant criminal history. Juror Johnson claimed to have never been convicted of a crime and, with the exception of a traffic ticket, to have never been to court, but in reality she had seven prior convictions for theft and passing bad checks. A juror's lack of candor or dishonesty on a juror questionnaire is a valid race-neutral reason for challenging that juror.[10] Consequently, we cannot say that the trial court erred in overruling Jordan's *Batson* challenges.

 {¶ 40} Jordan also failed to show that the state systematically used the criminal databases to exclude African–Americans from the jury-selection process. While the state checked the records of three of the four African–American jurors in the venire, it exercised peremptory challenges on only two of them, Hunter and Johnson. The third African–American, Hawthorne, who had no criminal record, was never challenged by the state and continued to serve on the jury.

---

10. *State v. Turner,* 7th Dist. No. 93 CA 91, 2004-Ohio-1545, 2004 WL 614808, at ¶ 105; *State v. Vaughn,* 7th Dist. No. 03–MA–49, 2004-Ohio-5122, 2004 WL 2334376, at ¶ 97, 99.

The state did not check the criminal record of the fourth African–American juror, Ms. Bagget–Bell. Thus, the record supports the state's argument that it did not use the information from these criminal databases to systematically exclude African–American jurors. Because Jordan failed to show either a *Batson* violation or that his jury lacked a fair cross-section of the community, we overrule his first and second assignments of error.

### Impeachment and the Right to Confrontation

{¶ 41} In his third assignment of error, Jordan contends that the trial court violated his Sixth Amendment right to confrontation when it permitted the state to present his brother Jermaine's statement to police and his grand-jury testimony in the guise of impeachment evidence.

{¶ 42} At trial, the state called Jordan's brother, Jermaine Higgins, to testify that he saw Jordan shoot Williams. When Jermaine testified instead that he could not really see Jordan that night, the prosecuting attorney secured a finding by the trial court that Jermaine was a hostile witness and proceeded to impeach him with a handwritten statement that he had given to the police, as well as with his grand-jury testimony.

{¶ 43} Jordan contends that the trial court erred by permitting the state to impeach Jermaine. But the record reveals that the state made the requisite showing of surprise and affirmative damage under Evid.R. 607 to impeach Jermaine with his prior statement and grand-jury testimony. While Jermaine had told the police and the grand jury that he had observed Jordan shoot RaeMone, he surprised the state by testifying at trial that he could not see Jordan the night of the shooting. Consequently, we cannot say that the trial court erred in allowing the state to impeach Jermaine with his prior statements.

{¶ 44} Jordan, relying on *State v. Duncan,*[11] next contends that even if the state made the requisite showing under Evid.R. 607, it improperly used Jermaine's statements as substantive evidence of his guilt. But Duncan is factually distinguishable. In Duncan, we held that the trial court committed error in admitting the grand-jury testimony of a witness because the testimony "involved statements made by others, offered for the truth of the matter of those statements," and not for impeachment purposes.[12] In contrast, Jermaine's grand-jury testimony involved only what Jermaine had observed and did not involve the statements of others. Furthermore, the trial court gave the jury a limiting

---

11. *State v. Duncan,* 154 Ohio App.3d 254, 2003-Ohio-4695, 796 N.E.2d 1006, at ¶ 60–64.

12. Id. at ¶64.

instruction directing it to consider Jermaine's prior statements for impeachment purposes only.

{¶ 45} Jordan further contends that the state utilized Jermaine's testimony as substantive evidence of his guilt in closing argument. But the prosecutor framed the issue of Jermaine's statements as one of credibility, not one of substantive proof of Jordan's guilt. The prosecuting attorney encouraged the jury to think about how Jermaine testified and to take into account the bias or interest that he might have had when weighing his testimony.

{¶ 46} Jordan additionally maintains that the trial court violated his right to confrontation under the Sixth Amendment to the United States Constitution when it admitted Jermaine's out-of-court statements into evidence.

{¶ 47} In *Crawford v. Washington*,[13] the United States Supreme Court held that the Confrontation Clause prohibits the introduction of out-of-court testimonial statements by witnesses who are not called to testify at trial.[14] But the court expressly stated that "the Confrontation Clause * * * does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[15] Because Jordan was given the opportunity to cross-examine Jermaine at length about his prior statements, and because his prior statements were admitted solely for the nonhearsay purpose of impeachment, they raised no Confrontation Clause concerns.[16] We, therefore, overrule his third assignment of error.

**Weight and Sufficiency**

{¶ 48} In his fourth, fifth, and sixth assignments of error, Jordan alleges that his convictions were based on insufficient evidence, that they were against the manifest weight of the evidence, and that the trial court erred by denying his motions for a judgment of acquittal.

{¶ 49} When reviewing a trial court's denial of a Crim.R. 29 motion, this court applies the same standard of review that it would in reviewing a challenge based upon the sufficiency of the evidence.[17] When a defendant claims that his conviction is supported by insufficient evidence, this court must review the

---

13. *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

14. Id. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.

15. Id. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9.

16. See *State v. Gaines*, 1st Dist. Nos. C–040122 and C–040139, 2005-Ohio-3032, 2005 WL 1413199, at ¶ 23.

17. *State v. Johnson*, 1st Dist. Nos. C–020256 and C–020257, 2003-Ohio-3665, 2003 WL 21568701, at ¶ 50.

evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found all the elements of the crime proved beyond a reasonable doubt.[18] When reviewing a defendant's claim that his conviction is against the manifest weight of the evidence, this court must weigh the evidence and the credibility of the witnesses to determine if the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.[19]

{¶ 50} To convict Jordan of aggravated murder, the state had to show that Jordan had purposely caused RaeMone's death "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * the offense of robbery * * *."[20]

{¶ 51} Multiple witnesses testified that Jordan was carrying a black semi-automatic weapon on the night of the murder. Celeste and Qianna testified that they were standing near RaeMone when they saw Jordan approach him, demand his property, and shoot him in the chest. Petrina testified that she was sitting in her car when she saw Jordan shoot RaeMone and then rifle through his pockets. Moreover, Jason testified that immediately after he heard gunshots, Jordan ran to the car and told him that he had robbed someone. Jason and Clarence, at Jordan's request, then hid Jordan's gun in the woods near the hospital. With Clarence's assistance, the police subsequently recovered a black semiautomatic weapon from the woods. Ballistics testing confirmed that eight cartridge casings at the scene had been fired from the gun and that the autopsy bullet was consistent in type and caliber with the ammunition for the gun. When viewed in the light most favorable to the state, the evidence was sufficient to convict Jordan of the aggravated murder of RaeMone. Thus, the trial court did not err in overruling Jordan's Crim.R. 29 motion.

{¶ 52} Nor can we conclude, given our review of the record, that the jury lost its way and created such a manifest miscarriage of justice that we must reverse Jordan's conviction and order a new trial. Jordan attacks the credibility of the state's eyewitnesses. He contends that inconsistencies in their testimony regarding the robbery and shooting render his conviction against the manifest weight of the evidence. Jordan points out that the state's eyewitnesses all testified that he was standing anywhere from two to five feet from RaeMone when he shot him, while the coroner testified that RaeMone had been shot at

---

18. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132.

19. *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652.

20. R.C. 2903.01(B).

close range. Thus, Jordan contends, he could not have been the person who killed RaeMone.

{¶ 53} The state presented several witnesses who testified that Jordan had fired a single shot at RaeMone that was followed by a flurry of other gunshots. RaeMone died from a single gunshot wound to the chest. The jury could have reasonably concluded that Jordan had fired the fatal shot that night and that the eyewitnesses, who had utilized a series of photos throughout the trial to show the jury where RaeMone and Jordan were standing at the time of the shooting, had simply overestimated the distance between Jordan and RaeMone at the time of the shooting. We, therefore, overrule Jordan's fourth, fifth, and sixth assignments of error and affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and DOAN, J., concur.