DECISION. *Page 2 
{¶ 1} Defendant-appellant Jason Jones was indicted for two counts of murder and one count of involuntary manslaughter, each carrying accompanying firearm specifications. All charges related to the death of Junis Sublett. Jones sought to suppress identification testimony. After a hearing, his motion to suppress was denied by the trial court. The case proceeded to a jury trial, where Jones was acquitted of murder and all firearm specifications but found guilty of involuntary manslaughter. Jones received a sentence of eight years' imprisonment.
 {¶ 2} Jones now appeals, alleging in seven assignments of error (1) that his conviction was not supported by sufficient evidence; (2) that his conviction was against the manifest weight of the evidence; (3) that the trial court erred in overruling his Crim.R. 29 motion for an acquittal; (4) that the trial court violated Evid.R. 404(B) by allowing evidence of Jones' arrest on drug-related charges; (5) that the trial court erred in denying Jones' motion for a mistrial based on prosecutorial misconduct; (6) that the trial court erred in denying Jones' motion to suppress; and (7) that the trial court imposed a sentence contrary to law.
 {¶ 3} For the following reasons, the judgment of the trial court is affirmed.
 Factual Background {¶ 4} Junis Sublett was shot in the head and run over by a speeding automobile as he and Randy Washington attempted to rob two drug dealers, Jason Jones and James Marshall, on May 18, 2005. *Page 3 
 A. The State's Witnesses {¶ 5} Randy Washington testified during trial that he, Sublett, and DeAngelo Tait had hatched a plan to rob a drug dealer. Washington had listened to a telephone call between Tait and James Marshall, during which Tait had set up a drug sale between Marshall and Washington and Sublett. According to Washington, the sale was for two pounds of marijuana. Washington and Sublett planned to rob Marshall when he arrived for the sale. Washington testified that Sublett was going to conduct the actual robbery and that he had planned to drive the getaway car. The drug sale was to take place in the Pleasant Run Apartments.
 {¶ 6} Washington stated that Marshall and Jason Jones arrived at the apartment complex in a green Dodge Durango. Jones, whom Washington had never seen prior to this event and whose name he did not know at the time, was driving the car. Marshall called Sublett's cellular telephone when they arrived, and Washington and Sublett approached the Durango. Washington stood on the driver's side of the vehicle, next to Jones. Sublett stood on the passenger side of the vehicle and eventually climbed into the Durango's back seat. Once Jones and Marshall showed him the marijuana, Washington began to walk away from the Durango. Washington testified that he had waited in a nearby breezeway until he received a signal from Sublett indicating that he should get their getaway car. As he was running to the car, Washington heard gunshots. He panicked, entered his car, and began to drive away. Washington testified that he saw Sublett lying on the ground, bleeding. Washington approached Sublett and called the police. According to Washington, he saw two plastic bags full of marijuana on the ground near Sublett. Washington removed the marijuana from the scene and hid it in a nearby apartment.
 {¶ 7} Washington testified that, during an interview with the Springfield Township Police following Sublett's murder, he was able to tell the police where *Page 4 
Marshall lived. He further identified Marshall in an individual photograph and Jones in a photographic lineup. Washington admitted that he had been charged with murder for his role in helping to plan the robbery that resulted in Sublett's death. Washington stated that he had not been promised anything in return for his testimony, but that he was hoping to receive some leniency in exchange for it.
 {¶ 8} DeAngelo Tait testified that he had set up a drug sale between Marshall and Washington and Sublett after Washington had told him that Sublett needed some "pot." According to Tait, the sale was for two and a half pounds of marijuana, of which he was to receive half a pound. Tait believed that he had only set up a drug sale, and he did not know that Washington and Sublett intended to rob Marshall. Tait further admitted that he had prior convictions for aggravated robbery and receiving stolen property, and that he had pled guilty to manslaughter relating to Sublett's death, although he had not yet been sentenced for that offense.
 {¶ 9} The state additionally presented the testimony of Latonia Lawson and Virginia Banks. Both Lawson and Banks testified that they were at the Pleasant Run Apartments on May 18, 2005, and that they had heard gunshots and seen a man fall to the ground. Both saw a green sports utility vehicle speed away and drive over the man. Lawson testified that she had called 911 and ran over to the man. She saw more than one bag lying around him, but could not recall what was inside the bags. Banks testified that the green car had some kind of stickers or graffiti on its windows.
 {¶ 10} Harry Patel, general manager for a Days Inn motel in Indianapolis, testified that at approximately 10:22 p.m. on May 18, 2005, a man named Fred Jones checked into his motel. This man listed his vehicle as a 1998 Dodge Durango, and although he had checked in with the name Fred Jones, the cardholder's name on the receipt signed by the man was Jason Jones. The state presented additional testimony from Jamie Starkey, an employee of the Ohio Bureau of Motor Vehicles. Starkey identified a state identification card registered to Jason Jones and containing *Page 5 
a photograph of Jones. Starkey further identified a license registered to a Frederick White Jones, but containing a photograph of Jason Jones.
 {¶ 11} Frederick Mattress, a regional security manager for PNC Bank, testified that, on May 26, 2005, a search warrant was executed on a safety deposit box registered to Jones and Sheila Marshall at PNC Bank's Pleasant Ridge branch. The box was empty when searched, but records indicated that Jones had signed to obtain access to the box on May 20, 2005. Bennie Phiefer, a fraud-investigations manager for PNC Bank, testified that he was present for the execution of a search warrant on a safety deposit box at PNC Bank's Hyde Park branch on May 26, 2005. The box was owned by Jones and contained $50,000.
 {¶ 12} Springfield Township Police Officer Nicholas Peterson testified that he had responded to a dispatch regarding a shooting at the Pleasant Run Apartments. Peterson was told by the dispatcher that a sports utility vehicle had been seen leaving the scene. Upon his arrival, Peterson saw a body and a scattered pile of marijuana on the ground. Peterson additionally noticed a broken cellular phone, tire marks, and two pools of blood. Peterson testified that the body was lying in the path of the tire marks.
 {¶ 13} Springfield Township Lieutenant David Schaefer testified that, on May 19, 2005, he had shown Washington a photographic lineup, and that Washington had identified Jones as the driver of the green Durango. Springfield Township Detective Pat Kemper testified that he had returned to the Pleasant Run Apartments on May 23, 2005, to search for bullet casings and projectiles, as these items had not been recovered. Kemper found a spent casing at the scene, although he could not definitively state that the casing was related to Sublett's murder.
 {¶ 14} Springfield Township Police Officer Phil Crowley testified that he had obtained from a hospital a weapon that had been found in Sublett's clothing. It was a fully loaded .32-caliber Smith and Wesson revolver. Springfield Township Police *Page 6 
Detective James Ohl testified that he had test-fired this weapon and that it was operational. Ohl further testified about his investigation into Sublett's murder. According to Ohl, Washington had provided the police with Marshall's address, and although he did not know Marshall's name, Washington had referred to him as a "white Mexican." From the address, the police obtained Marshall's name, and Washington identified Marshall from a photograph. The police ran Marshall's name in a LexisNexis police database. This database returned the name of Sheila Marshall, Marshall's sister. And by entering Sheila Marshall's name into the database, Ohl received Jason Jones' name, as Jones and Sheila Marshall owned property together and were in a relationship. Ohl discovered that Sheila Marshall owned a green Dodge Durango.
 {¶ 15} Ohl further testified that, on May 20, 2005, he had received word that Sheila Marshall had been stopped on Interstate 75 while driving the Durango. Ohl responded to this scene. He testified that, because Sublett had been run over, the Durango was tested for forensic evidence such as transfer of blood, skin, and clothing, but that the results had come back inconclusive.
 {¶ 16} Ohl received permission from Sheila Marshall to search her residence. Sheila Marshall lived in Butler County, and therefore the search was conducted by police from that jurisdiction, although Ohl was present for it. Police found 429 pounds of marijuana in the home, inside two different freezers. During the search, police also found a box of Winchester nine-millimeter fully jacketed bullets. Ohl testified that he had compared the spent casing found in the Pleasant Run Apartments to the casings on the bullets in Sheila Marshall's residence. The spent casing was similar to some of the bullets found in the home. Specifically, they were made by the same manufacturer and contained the same markings on the head of the casings. Numerous documents addressed to and pertaining to Jones were found in the residence, including a delivery order for a chest freezer. *Page 7 
 {¶ 17} According to Ohl, he spent much time trying to find both James Marshall and Jones. Ohl eventually was able to trace Marshall to North Carolina. Ohl contacted officers in Lincolnton, North Carolina. He sent to the Lincolnton officers photographs of both Marshall and Jones, and asked them to investigate an address that he had provided. Marshall was apprehended in North Carolina by Lincolnton police officers. The state presented the testimony of two officers from Lincolnton, North Carolina, concerning the apprehension of Marshall. The Lincolnton officers did not find Jones with Marshall, but one officer had encountered Jones at the designated address in North Carolina during an unrelated investigation.
 {¶ 18} The state presented testimony from Chief Deputy Coroner Gary Utz. Utz testified that Sublett had died from perforation of his skull and brain caused by a gunshot wound to his head. The bullet had entered Sublett's skull behind his left ear and exited on the right side of his temple. According to Utz, Sublett had not experienced a contact or close-range wound, as there was no stippling present. Utz further testified that extensive bruising was found on Sublett's torso and upper extremities. The bruising was consistent with tire marks. Utz stated that these injuries were minor compared to the brain injury that Sublett had experienced, but that they could have caused his death.
 B. Jones' Witnesses {¶ 19} James Marshall testified on behalf of Jones at trial. According to Marshall, on May 18, 2005, DeAngelo Tait had asked him to take Tait's cousin, D.C., to the Pleasant Run Apartments to sell marijuana to someone named Brandon. Marshall testified that D.C. had picked him up in a green Chevrolet Tahoe. When they arrived at the apartments, Marshall noticed two suspicious-looking men. He called Brandon, but one of the men answered the phone and asked him, "Is that you *Page 8 
in the green truck?" The two men, whom Marshall later came to know as Washington and Sublett, walked over to D.C.'s car. Marshall warned D.C. that the men intended to rob them, but D.C. did not heed his warning. According to Marshall, Randy Washington indicated that he had previously seen Marshall at a club, but Marshall denied ever seeing Washington prior to this incident. The two men stated that Brandon was in his apartment, and that they were just verifying that Marshall and D.C. were not the police.
 {¶ 20} Sublett got into the back seat of D.C.'s car. He looked at the marijuana and demanded to purchase it for a lower price. Marshall testified that D.C. agreed to lower the price, but asked to see some money. Sublett then pulled out a gun, pointed it at Marshall, and told Marshall to put his head between his legs. Sublett took the marijuana, exited from the car, and stood at the passenger window next to Marshall. Sublett attempted to open Marshall's door, and Marshall, who still had his head down, heard gunshots above his shoulder and head coming from the direction of D.C. Marshall sat up and saw D.C. with a gun in his hand. D.C. sped away, and Marshall testified that he felt the car drive over something. D.C. drove into Kentucky; at some point, Marshall jumped out of the car and ran away.
 {¶ 21} According to Marshall, he called a friend, Ryan Alexander, to pick him up in Kentucky. He spent the night at Alexander's house, and the next day Alexander drove him to Louisville, Kentucky, to meet Jones. Alexander was involved in a car accident, and while Jones took Alexander home, Marshall stayed in a hotel in Kentucky. Jones called Marshall at the hotel, stating that Jones' face was on the news as a suspect in a murder. He and Jones then traveled to North Carolina to stay with Marshall's aunt. Marshall admitted that he had been charged with murder for the death of Junis Sublett, and that he had prior convictions for breaking and entering, receiving stolen property, theft, and several drug-related offenses. *Page 9 
 {¶ 22} Ryan Alexander testified that he had picked up Marshall in Kentucky on either the 18th or the 19th of May 2005, and that Marshall had been hysterical. He then took Marshall to Louisville, Kentucky, where they met Jones.
 {¶ 23} Finally, Jones presented the testimony of Larry Dehus. Dehus testified that he had experience in forensic science and that he owned a consulting and testing laboratory business, Law-Science Technologies, that evaluated criminal evidence and conducted accident reconstruction. According to Dehus, if a vehicle had run over a human body, a thorough inspection of that vehicle would have revealed some type of trace evidence such as hair, fiber, or blood, for up to five or six weeks after the date of the incident. But Dehus conceded that he had never examined the vehicle alleged to have run over Sublett in this case.
 Sufficiency, Weight, and Rule 29 {¶ 24} In his first, second, and third assignments of error, Jones argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence, and that the trial court erred in overruling his Crim.R. 29 motion for an acquittal. We address these assignments together.
 {¶ 25} When reviewing the record for the sufficiency of the evidence, this court must view all the evidence presented in the light most favorable to the prosecution and determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt.[1] The same standard is employed to determine whether a trial court properly overruled a Crim.R. 29 motion for an acquittal.[2] But when reviewing the manifest weight of the evidence, this court "weighs the evidence and all reasonable inferences, considers the credibility of *Page 10 
witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed."[3]
 {¶ 26} Jones was found guilty of involuntary manslaughter. Involuntary manslaughter is defined in R.C. 2903.04(A) as "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." In this case, the state alleged that Jones had caused the death of Sublett while committing or attempting to commit the offense of trafficking in drugs. The jury was instructed that, to find that Jones had committed or attempted to commit drug trafficking, it had to find that Jones had knowingly sold or offered to sell marijuana.
 {¶ 27} Viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could reasonably have found that Jones had caused the death of Sublett while trafficking in drugs, specifically while offering to sell marijuana. Regarding the trafficking in drugs, both Randy Washington and DeAngelo Tait testified that Tait had arranged for a sale of marijuana from Marshall to Washington and Sublett. The jury was presented with evidence that Jones had arrived with Marshall to conduct the sale. Washington further testified that he had seen the marijuana before the sale or robbery occurred, and that he had removed two bags of marijuana from Sublett's body. Officer Peterson saw a scattered pile of marijuana on the ground near Sublett. Moreover, 429 pounds of marijuana were found in a home shared by Jones and Sheila Marshall, and $50,000 was found in a safety deposit box registered to Jones.
 {¶ 28} The jury was further presented with sufficient evidence that Jones had caused Sublett's death. It heard testimony that Washington had identified Jones as *Page 11 
the driver of the car that had run over Sublett, and that Jones' girlfriend owned a green Dodge Durango, a vehicle that matched the description of this same car. Also linking Jones to the crime was Detective Ohl's testimony that the spent casing found at the scene was made by the same manufacturer and contained similar markings to the casing on bullets found in Jones' home. The evidence further established that, several hours after Sublett's murder, a Fred Jones had checked into a motel in Indianapolis, registered his vehicle as a 1998 Dodge Durango, and paid with a credit card belonging to Jason Jones. The jury heard testimony from an employee of the Ohio Bureau of Motor Vehicles that Jones had received a driver's license containing his own photograph but issued in the name of Frederick White Jones. And Jones had visited a safety deposit box, which was empty when searched, two days after Sublett's murder, and he had then resided in North Carolina for approximately one month. Moreover, Chief Deputy Coroner Utz testified that Sublett had died from receiving a gunshot wound to his head, but that the injuries he had received after being run over by a motor vehicle could have caused his death as well.
 {¶ 29} Following our review of the record, we conclude that Jones' conviction for involuntary manslaughter was supported by sufficient evidence and that the trial court did not err in overruling his Crim.R. 29 motion for an acquittal. And we further conclude that Jones' conviction was not against the manifest weight of the evidence. The jury was aware of the prior convictions of several of the witnesses. And as the jury was able to personally view the demeanor of the witnesses, it was in the best position to judge their credibility. The jury was entitled to reject James Marshall's testimony that someone named D.C., rather than Jones, had been in the car during the drug sale and had shot Sublett. On this record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice.
 {¶ 30} The first, second, and third assignments of error are overruled. *Page 12 
 Evid.R. 404(B) {¶ 31} In his fourth assignment of error, Jones argues that the trial court erred by allowing the state to present, in violation of Evid.R. 404(B), evidence concerning Jones' arrest on drug charges and the discovery of drugs and weapons at Jones' home. Specifically, Jones takes issue with the introduction of evidence that 429 pounds of marijuana, as well as weapons and ammunition, had been found in a home owned by Jones and Sheila Marshall, and that he had drug-related charges pending against him in Butler County related to the marijuana found in his home.
 {¶ 32} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." But such evidence is admissible for other purposes, including to establish identity, scheme, plan, and absence of mistake or accident.[4] Evidence of a scheme or plan is relevant to help the jury understand the background of a case.[5] As this court has previously noted, "[background information is admissible to give the jury the setting of the case. Generally, the jury is entitled to know the setting of a case because it cannot be expected to make its decision in a void, without knowledge of the circumstances of the acts which form the basis of the crimes charged."[6] The evidence at issue in this case helped the jury to understand the circumstances surrounding and the events leading up to Sublett's murder, in particular Jones' involvement with the sale of marijuana.
 {¶ 33} This court has specifically held that other-acts evidence is admissible to show a defendant's involvement in a drug-dealing operation.[7] In this case, the evidence was admissible for exactly that purpose. To secure a conviction for involuntary manslaughter, the state was required to prove that Jones had caused the *Page 13 
death of Sublett while trafficking in marijuana. And evidence concerning the marijuana found inside Jones' home, as well as the charges pending against Jones in Butler County, was relevant to proving that Jones had trafficked in marijuana. Given that the testimony from Randy Washington and DeAngelo Tait indicated that the drug sale had been set up with James Marshall, this evidence was extremely helpful in establishing Jones' identity as Marshall's companion and the driver of the automobile.
 {¶ 34} And the evidence concerning the weapons and ammunition found inside Jones' home further helped to establish Jones' identity as the driver of the vehicle that had run over Sublett, as Detective Ohl had testified that the casings on several of the bullets found inside Jones' home were similar to the spent casing found at the murder scene.
 {¶ 35} Consequently, we conclude that the trial court did not err in admitting this evidence. The fourth assignment of error is overruled.
 Prosecutorial Misconduct {¶ 36} In his fifth assignment of error, Jones argues that the trial court erred in denying his motion for a mistrial based on prosecutorial misconduct in closing argument.
 {¶ 37} Jones takes issue with the prosecutor's labeling of James Marshall as a liar and a person of moral turpitude. He further argues impropriety in the prosecutor's comments that Marshall had two bags of marijuana, that 429 pounds of marijuana had been found inside Jones' home, and that Jones was a drug dealer.
 {¶ 38} To support a claim of prosecutorial misconduct, a defendant must prove that the prosecutor's remarks were improper and that they had a prejudicial *Page 14 
effect on substantial rights of the defendant.[8] The prosecutor's statements must not be evaluated in isolation, but rather in light of the entire closing argument.[9] "[T]he prosecution is normally entitled to a certain degree of latitude in its closing remarks."[10]
 {¶ 39} We first address the prosecutor's labeling of Marshall as a liar and a person of moral turpitude. Defense counsel objected to the comment concerning moral turpitude, and the trial court sustained the objection. "Error cannot be predicated on objections which have been sustained by the trial court."[11] And it was not improper for the prosecutor to refer to Marshall as a liar. This court has held that "it is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonabl[y] supports that characterization."[12] When commenting that Marshall had lied, the prosecutor cited specific testimony by Marshall and how it conflicted with both physical evidence and testimony from other witnesses. The evidence reasonably supported the prosecutor's statement.
 {¶ 40} Similarly, the prosecutor's remarks that Marshall had possessed two bags of marijuana, that 429 pounds of marijuana had been found inside Jones' home, and that Jones was a drug dealer were all fair commentary on the evidence presented at trial. In the preceding assignment of error, we determined that it was not error to allow the introduction of evidence concerning the marijuana found inside Jones' home. Accordingly, the prosecutor was entitled to comment on that evidence during closing argument. The jury heard further testimony that Jones and Marshall had two bags of marijuana inside their car and that, following Sublett's *Page 15 
murder, Washington had removed two bags of marijuana from the scene. This testimony supported the prosecutor's comments during closing argument.
 {¶ 41} Jones further argues that, because the marijuana had never been tested to verify that it was actually marijuana, it was improper for the prosecutor to tell the jury that it was in fact marijuana. But Jones' attorney had cross-examined the police on this issue and had made reference to it during closing argument. The jury was aware that the marijuana had not been tested. The testimony and the argument concerning the marijuana were proper; it was within the province of the jury to determine what weight to assign the evidence.
 {¶ 42} These remarks during closing argument were not improper and did not rise to the level of prosecutorial misconduct. We conclude that the trial court properly denied Jones' motion for a mistrial, and the fifth assignment of error is overruled.
 Motion to Suppress {¶ 43} In his sixth assignment of error, Jones argues that the trial court erred in denying his motion to suppress identification evidence.
 {¶ 44} A two-part test is used to determine whether identification testimony should be suppressed.[13] First, the defendant must demonstrate that the identification procedure was unnecessarily suggestive.[14] If the defendant meets this burden, the court must then determine whether the procedure was so suggestive that it gave rise to a substantial likelihood of misidentification.[15] Even if the identification procedure was suggestive, a resulting identification is admissible as long as it is proved to be reliable.[16] *Page 16 
 {¶ 45} During an interview with the Springfield Township police following Sublett's death, Randy Washington was shown photographs of various individuals. But these photographs were apparently lost or destroyed, and neither Washington nor any Springfield Township officers could recall who was depicted in the photographs. Jones argues that it is reasonable to conclude that one of these photographs was of Jones. He thus argues that Washington's later identification of him in a photographic lineup was unreliable.
 {¶ 46} We are not persuaded by Jones' argument. During a hearing on Jones' motion to suppress, Detective Ohl testified that the interview with Washington had begun late in the evening on May 18, 2005, and continued into the early morning hours of May 19. But he further testified that the police were not aware of Jason Jones and did not consider him as a potential suspect until the afternoon of May 19. Consequently, the police did not even have a photograph of Jones during Washington's interview.
 {¶ 47} Given that the police did not have a photograph of Jones in their possession at the time of Washington's interview, it necessarily follows that the individual photographs shown to Washington did not contain a photograph of Jones, and, accordingly, they did not influence Washington's identification of Jones in a later photographic lineup.
 {¶ 48} The photographic lineup was not unnecessarily suggestive, nor was the identification unreliable, and the trial court did not err in denying Jones' motion to suppress. The sixth assignment of error is overruled.
 Sentencing {¶ 49} In his seventh assignment of error, Jones argues that the trial court erred by imposing an excessive sentence. As we have stated, Jones received a sentence of eight years' imprisonment. *Page 17 
 {¶ 50} Following the Ohio Supreme Court' s decision in State v.Foster, a trial court has full discretion to impose a sentence that is within the available statutory range, and the court no longer needs to make findings or to provide reasons in support of such a sentence.[17]
Jones was convicted of involuntary manslaughter, a felony of the first degree carrying a sentencing range of three to ten years' imprisonment.[18] The trial court's imposition of eight years' imprisonment fell within this range.
 {¶ 51} Accordingly, we conclude that the sentence imposed was not excessive. Jones' seventh assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
CUNNINGHAM and DINKELACKER, JJ., concur.
[1] See State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[2] See State v. Jordan, 167 Ohio App.3d 157, 2006-Ohio-2759,854 N.E.2d 520, ¶ 49.
[3] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[4] See Evid.R. 404(B). See, also, R.C. 2945.59.
[5] See State v. Wilkinson (1980), 64 Ohio St.2d 308, 315-316,415 N.E.2d 261.
[6] State v. Duncan (1998), 130 Ohio App.3d 77, 86, 719 N.E.2d 608, internal citations omitted.
[7] See State v. Dominguez (Jan. 29, 1999), 1st Dist. No. C-980148.
[8] State v. Smith (1998), 130 Ohio App.3d 360, 366,720 N.E.2d 149.
[9] See State v. Kelly, 1st Dist. No. C-010639, 2002-Ohio-6246, at ¶ 22, citing State v. Keenan (1993), 66 Ohio St.3d 402, 410,613 N.E.2d 203.
[10] State v. Smith (1984), 14 Ohio St.3d 13, 470 N.E.2d 883.
[11] State v. Austin (Dec. 17, 1986), 1st Dist. No. C-860148.
[12] State v. Murrell, 1st Dist. No. C-020333, 2003-Ohio-2068, ¶ 25.
[13] State v. Haynes, 1st Dist. No. C-020685, 2004-Ohio-762, ¶ 3.
[14] Id.
[15] Id.
[16] Id.
[17] State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus.
[18] See R.C. 2929.14. *Page 1