[Cite as *State v. Monroe*, 2011-Ohio-3045.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
### No. 94768

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARREN MONROE

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-505319

**BEFORE:**     Sweeney, J., Kilbane, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:**     June 23, 2011

**ATTORNEY FOR APPELLANT**

Paul Mancino, Jr., Esq.
75 Public Square, Suite 1016
Cleveland, Ohio 44113-2098

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By:   Thorin O. Freeman, Esq.
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶ 1} Defendant-appellant, Darren Monroe ("defendant"), appeals from his conviction for voluntary manslaughter with a firearm specification. Within his nine assignments of error, defendant asserts that he was denied a fair trial in violation of his due process rights and denied his right of confrontation in multiple instances. Additionally, defendant challenges the court's jury instructions , contends his conviction was based upon insufficient evidence, and asserts his conviction was against the manifest weight of the evidence.  For the reasons that follow, we affirm.

{¶ 2} This matter is before us for the second time.  This court previously affirmed the trial court's order granting defendant a new trial following defendant's initial conviction for murder.  See *State v. Monroe*, Cuyahoga

App. No. 92291, 2009-Ohio-4994. At defendant's second trial, the following evidence was presented:

{¶ 3} In the early morning hours of December 22, 2007, David Bober was shot and killed near his home on West 48th Street in Cleveland, Ohio. Prior to that time, David had been drinking with his brother Raymond and his friend Milton. According to Raymond and Milton, the men consumed excessive amounts of alcohol, which they estimated at approximately 16 to 18 beers and two to eight shots apiece. Raymond and Milton also admitted to using cocaine that evening as well; however both men said David did not use cocaine that night.

{¶ 4} Around 3 a.m., David drove Raymond's car home with Raymond as a passenger. Milton followed behind them in his own car to make sure they arrived safely. David lived on W. 48th Street. Milton and Raymond admitted they were highly intoxicated but maintained David and Milton could operate the vehicles.

{¶ 5} In the area of W. 48th Street and Koch Court, Raymond heard David exchange words with someone. Raymond did not see anyone but noticed David was agitated.[1] David parked the car behind his house and ran through the alley up to W. 48th Street. Raymond followed about twenty seconds later.

---

[1]Raymond said he was crouched down in the car because he was concerned about David's erratic driving.

At that point, Raymond heard gunshots and saw David running back towards him. Raymond shouted, "we're cool, we're cool" in an effort to stop the gunfire. The person kept shooting at them. Street lights were on and Raymond saw a man standing in the street approximately ten to 20 feet away from him. Raymond believed the person was wearing a hooded jacket, which he later described as a "big jacket." He got a good look at the individual's face but said "his height and weight threw me off." Raymond explained that he is not good at estimating height and weight and could only describe the shooter's body type as being between thin and real heavy.

{¶ 6} Raymond and David ran towards David's house. Raymond observed David limping and still heard gunshots. About five shots were fired. Then, Raymond saw David collapse after being hit through the back. He was running for his life and did not turn back around to see where the shooter was standing. Raymond tripped over David, turned David over and saw blood coming out of David's chest. Raymond rode in the ambulance with David to the hospital but returned to the scene after learning that David was dead. Raymond acknowledged that he was intoxicated during the event and was also in a state of shock.

{¶ 7} Raymond gave a description to police that night where he estimated the shooter's height as approximately six feet and his weight as 180 pounds. At trial, however, Raymond said "the description, the height and the weight at

that time couldn't have been right." Police did not show Raymond a line-up nor did they ask him to identify anyone from a photo array.

{¶ 8} Milton corroborated much of Raymond's testimony about the evening. He saw David turn right onto Koch Court but does not recall seeing anyone near the intersection. He went to the side door of David's house expecting to be let inside. Instead, he heard David arguing with someone towards the front of the house. David was aggravated and sounded angry or mad. Milton did not recognize the other voice but it was a man who also sounded aggravated. Milton ran to the front of the house and saw Raymond and David on one side of Koch Court and a man on the other side of the street near a car. Raymond was trying to break up the argument. Although the street lights were on, the man was standing in a shadow area and wore all black. Like Raymond, Milton had difficulty determining the man's height and estimated it was between 5'10" to 5'11". It was a black male who appeared to weigh more than 250 lbs.

{¶ 9} Milton started running and heard gunfire. David came up behind him, said "I'm hit" and fell over. Milton called 911 and was in a panic. Milton gave a statement to police that night but was devastated by his friend's death. Milton described himself as being "out of control." Police asked him to look at someone near the intersection under the street light but he did not think it was the shooter. He was closer to this person than he was to the

shooter. Raymond got closer to the shooter than Milton did. Milton did not observe any other people in the area at the time of the shooting besides David, Raymond, and the shooter.

{¶ 10} Officers who responded to the scene described Raymond and Milton as intoxicated with slurred speech. Police received information via 911 from an anonymous caller who claimed to have witnessed the crime. The 911 tapes that related to the shooting were introduced and Dennis Smith authenticated his voice as the caller. As a result of these calls, the crime scene was expanded to include the area of 3289 W. 48th Street, which was defendant's residence as well as the residence of Dennis Smith's son.

{¶ 11} Dennis Smith explained that his son Dan had witnessed the shooting and asked him to make the call. Dan was afraid to get involved because he recognized his neighbor, who is the defendant, as the shooter. Dennis said he made the 911 calls because he was in fear for his son's life. The trial court provided a limiting instruction to the jury specifically instructing that the 911 tapes were not being offered to prove the truth of the matters asserted in them but for a different purpose. During his trial testimony, Dennis admitted to the jury that he was not at the scene that night contrary to what he had said on the 911 tapes. He acknowledged that his first 911 call was false because he was not an eyewitness. In a subsequent 911 call, Dennis

Smith disclosed that he was not an eyewitness but was relaying information provided by his son, Dan.

{¶ 12} Police testified that bullets bounce when they hit a hard surface and are not always found at the exact location from which they were expended. Photographs taken of the scene on the night of the shooting reflect that there was water on the ground. Police radio communications alerted the officers that the shooter was a heavyset black male.

{¶ 13} Dan Smith lived in the same building as defendant on December 22, 2007. Dan was living with his girlfriend Crystal Demopoulos. He was familiar with defendant's voice and had observed him standing and walking on previous occasions.

{¶ 14} Dan and Crystal were awake between 4 and 5 a.m. that day. Crystal was watching Dan play video games on a gaming system she gave him that day as a Christmas gift. They heard an argument outside. Crystal went to the window first and Dan later got up to look outside as well.

{¶ 15} Dan saw defendant wearing darker clothes standing and talking on the phone. He saw a group of people across the street. Defendant shot a couple times towards the group of three to four white people. They were all moving. Dan believed they were going towards their house. After the shooting, Dan heard defendant say nonchalantly, "I just had to shoot this guy." Dan identified defendant as the shooter but said defendant was about

80 pounds heavier at the time of this trial. According to Dan, defendant has a distinct walk and voice.

{¶ 16} Dan saw one shot but heard approximately three to four shots fired. Defendant started shooting in the driveway and moved out to the street. Crystal watched the incident longer than Dan did. Dan was on the floor and pulled Crystal down for safety.

{¶ 17} Dan wanted to remain anonymous but called his dad as well as 911. He did this because he noticed that the police were looking in the wrong area. He saw the police expand the crime scene after he provided them information.

{¶ 18} Dan observed defendant around one of the cars and moving towards the street near the apron of the driveway. Dan was about 20 to 25 feet away. He was unsure if there were six to eight black males on the street. In his previous testimony, Dan said he saw 6 to 8 black males in hoods walking across the street. The blinds were down on his windows.

{¶ 19} Crystal testified that she heard arguing and went to the window to look out of the blinds. She saw defendant walking to the back with a man she did not recognize but who was white with a slender build. Defendant was wearing a black hooded sweatshirt. She later saw defendant shooting a gun near the apron of the driveway. She recognized defendant. Dan eventually pulled her down to the ground and then the couple gathered their dogs and

turned off the lights in their apartment. They were afraid and did not want to be involved.

{¶ 20} Crystal heard about three to four shots. Crystal also heard defendant on the phone saying he shot someone. Defendant went back to his house. The couple was scared and abruptly moved out of that residence a few days later. Crystal testified that she did observe a group of people crossing Koch Court whom she believed were all black males. However, she did not see these individuals do anything in connection with the shooting. Det. Everett, who took Crystal's statement, testified that there was no physical evidence found on the scene that would indicate that these unidentified six to eight males played any role in the shooting.

{¶ 21} Dan was not able to make an identification from the photo array but insisted he could identify his neighbor if he saw him. Crystal was able to immediately identify defendant's photograph from the array as the shooter.

{¶ 22} Both Dan and Crystal testified that they had previous encounters with the defendant before witnessing the shooting. They described incidents where defendant threatened to kill their dogs and also an occasion where Dan insisted that defendant turn down the radio. Defendant resided in the W. 48th residence for approximately one month prior to the shooting.

{¶ 23} David's live-in girlfriend, Beatrice Lee, testified that she was awakened by banging on the door on December 22, 2007. She opened the

door and saw Milton on his cell phone and David in Raymond's arms. Raymond was saying, "he's gone."

{¶ 24} Police recovered two bullet casings that were found near a manhole cover at the intersection of W. 48th and Koch Court around 6 a.m. on December 22, 2007. This was consistent with the location of the shooter as described by Raymond and Milton.

{¶ 25} Various officers testified about the investigation that took place on that day. Lt. Foley was in charge of the crime scene. Lt. Foley brought defendant out of his house and into the street for a potential cold stand identification by Milton.

{¶ 26} Prior to Lt. Foley's testimony the court held an extensive hearing on defendant's objections to portions of his anticipated testimony, specifically non-verbal communications made by persons who were not testifying at the trial. The trial court made various rulings and Lt. Foley was given precise parameters as to the scope of his testimony before the jury. He was allowed to give only limited testimony as to the details of his investigation, which the defense agreed was permissible. The court indicated that Lt. Foley could testify that "based on what he learned, [he] was suspicious of what [he] saw." However, the court otherwise sustained the defense objection and prohibited Lt. Foley from testifying about certain facts that had lead him to defendant's residence.

**{¶ 27}** Lt. Foley explained that he saw individuals hanging out of a window. He then went to defendant's residence and a woman opened the door. About ten seconds later, a heavyset man walked into the kitchen area and was wearing pajama pants. Lt. Foley asked the man if he had been outside and the man said no. However, Lt. Foley observed wetness on the bottom of the man's pajama pants, which made him disbelieve the man's statement that he had not been outside. For that reason, Lt. Foley decided to bring him out for a cold stand identification procedure. This man was defendant. Ultimately, Milton did not identify defendant as the shooter and he was released.

**{¶ 28}** Officers Wagner and Katyinski assisted Lt. Foley in the investigation. Officer Wagner testified that he noticed that the bottoms of defendant's pants were wet and he did not observe defendant walking through any water. Wagner also testified that defendant appeared to have gained weight since the time of the shooting. Wagner corroborated that Milton was unable to identify defendant as the shooter.

**{¶ 29}** The trial court also allowed the testimony of the Cuyahoga County Coroner, Dr. Frank Miller, over defendant's objection. Dr. Miller testified concerning the autopsy report completed for David Bober, the decedent. Although Miller was not personally present for the autopsy, it was performed by individuals under the employ and supervision of his department but who

were no longer available to testify. The records confirmed that David had consumed at least nine to ten drinks but did not indicate the presence of any cocaine in his system.

{¶ 30} Investigators did not find any fingerprints on the recovered shell casings or any DNA linking defendant to the crime scene.

{¶ 31} Following the jury's verdict and his conviction, defendant pursued the instant appeal.

{¶ 32} "I.  Defendant was denied due process of law and a fair trial when the court permitted the officer in charge of the scene to testify to the truth of statements attributable to defendant."

{¶ 33} Defendant contends that the trial court erred by allowing Lt. Foley to testify about certain circumstances that lead to his decision to bring defendant before an eyewitness for potential identification as the shooter.  At the time Lt. Foley went to defendant's house, defendant was allegedly sleeping and the ground outside the house was wet.  Lt. Foley testified that defendant denied being outside, however, Lt. Foley observed that the bottom of defendant's pants were wet.  This observation led Lt. Foley to the conclusion that defendant lied when he said he had not been outside.  Lt. Foley stated that he did not believe that particular statement due to his observations that were inconsistent with it.  Defendant asserts that Lt. Foley explanation was

an improper comment on defendant's credibility that invaded the province of the jury and entitles him to a new trial.

{¶ 34} Defendant relies on case law that holds it is improper for a witness to vouch for the credibility of another witness. *State v. Young*, Cuyahoga App. No. 79243, 2002-Ohio-2744 (holding that it was plain error when a detective testified that a witness was "telling the truth.") This court has held that an officer is not vouching for a witnesses credibility by explaining the investigative procedure he followed and, therefore, the testimony is "admitted for proper purposes." See *State v. Vales*, Cuyahoga App. No. 81788, 2003-Ohio-6631, ¶33, citing, *In re: Shubutidze* (Mar. 8, 2001), Cuyahoga App. No. 77879; see, also, *State v. Axson*, Cuyahoga App. No. 81231, 2003-Ohio-2182, ¶67.

{¶ 35} In this case, Lt. Foley's testimony was directed to defendant's single comment that he had not been outside that was reasonably inconsistent with the wet cuffs that Lt. Foley observed on defendant's pants. This limited testimony did not invade the province of the jury. Lt. Foley's comments were offered merely to explain why he decided to present defendant to the eyewitness for a potential identification. Notably, Lt. Foley and Officer Wagner told the jury that the eyewitness was unable to positively identify defendant as the shooter and, therefore, defendant was released. Defendant maintains that the trial court also erred by allowing Det. Everett to testify

that his investigation led him to the conclusion that six to eight unidentified black males allegedly observed by Crystal Demopoulos "had no role in the crime that occurred" or the shooting. Defendant offers no case law in support of why the admission of this testimony was error and we find none.

{¶ 36} This assignment of error is overruled.

{¶ 37} "II. Defendant was denied his right of confrontation and cross-examination when the court permitted hearsay information."

{¶ 38} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶ 39} Here defendant challenges the portions of Lt. Foley's testimony where he said he "received information that directed [him] to that area (defendant's residence)," that he observed people in the windows of a residence, and Lt. Foley's explanation of what he did upon encountering a black female who answered defendant's door.[2]

{¶ 40} Defendant maintains the comments amounted to testimony of "nonverbal conduct" and therefore qualified as inadmissible hearsay

---

[2]Although defendant also complains about Lt. Foley's indication that he did not receive certain information from police officers, the court sustained defendant's objections to it and Lt. Foley made no indication who supplied the subject information.

statements and the admission of the testimony violated his right to confrontation.

{¶ 41} As set forth above, the trial court held an extensive hearing on the scope of Lt. Foley's testimony and sustained defendant's objections to testimony concerning any verbal statements and nonverbal conduct made by non-testifying witnesses. Defense counsel agreed that Lt. Foley's testimony that he observed people hanging out of a window would not qualify as hearsay. Lt. Foley's testimony to the jury was limited to saying that he saw people in a window and then he went to the rear residence of 3289 W. 48th Street. This testimony did not describe any nonverbal conduct that could be construed as an assertion being offered to prove the truth of the matter.

{¶ 42} Likewise, the trial court instructed Lt. Foley that he could not testify as to anything said by the female who answered the door of defendant's residence. And, he did not. Instead, Lt. Foley testified that he asked specific questions to the female, received responses (but did not provide the substance of the responses) that prompted further action by him. This testimony does not include a description of any verbal or nonverbal conduct that could be construed or intended as an assertion by the woman who answered the door.

{¶ 43} While the trial court sustained defendant's objection and excluded testimony of nonverbal conduct and statements of non-testifying witnesses, it did allow Lt. Foley to explain his conduct during the investigation. "[W]here

statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay." *State v. Blevins* (1987), 36 Ohio App.3d 147, 149, 521 N.E.2d 1105, citing, *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 240, 400 N.E.2d 401. The court in *Belvins* went on to hold that: "In order to admit out-of-court statements which explain an officer's conduct during the course of a criminal investigation, the conduct to be explained must be relevant, equivocal and contemporaneous with the statements. In addition, the statements must meet the standard of Evid.R. 403(A)." Id. at paragraph one of the syllabus. This court applied these conditions in *State v. Steward*, Cuyahoga App. No. 80993, 2003-Ohio-1337, ¶27-28.

**{¶ 44}** Assuming any of Lt. Foley's testimony could be construed to include any out-of-court statements, whether verbal or nonverbal, his testimony was appropriately limited under the above-cited conditions. He limited his testimony to relevant and contemporaneous events that served to explain his conduct during the investigation. Further, the probative value of the identified portions of his testimony was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury as proscribed by Evid.R. 403(A). This assignment of error is overruled.

{¶ 45} "III.   Defendant was denied due process of law and fair trial when the court permitted Dan Smith, a prosecution witness to read his entire police statement to the jury."

{¶ 46} Under cross-examination, Dan Smith was questioned about the statement he made to police.   Defense counsel read certain excerpts from Dan's statement to police, including his description of the suspect's height and weight.   Counsel also questioned Dan as to what he told police concerning his observations of people in the street, which was inconsistent with what he testified to at trial.   On re-direct, the state had Dan read the entire statement into the record.

{¶ 47} This court has held, "[w]here a portion of a witness' previous statement is introduced to illustrate an inconsistency with his present testimony, the entire statement is admissible in rebuttal. *Shellock v. Klempay Bros.* (1958), 167 Ohio St. 279, at 282.[3] This court acknowledged the state's right to use the entire document to rehabilitate a witness in *State v. Ciasullo*

---

[3]"[W]here, on cross-examination, a witness is impeached by a showing of prior statements made by him in a written instrument and apparently inconsistent with his statements on direct examination, an effort to rehabilitate such witness by reference to the same document used to impeach him is proper so long as the statements referred to and sought to be introduced in such effort to rehabilitate such witness are confined to an explanation of such apparent inconsistencies and do not serve to inject new issues into the case." *Shellock*, 167 Ohio St. at 282, 148 N.E.2d 57.

(Jan. 21, 1981), Cuyahoga App. Nos. 42702 and 43172, unreported, at 12-13. See, also, *Motorists Mut. Ins. Co. v. Vance* (1985), 21 Ohio App.3d 205, 207; *State v. Sprawl* (1982), 3 Ohio App.3d 406, 407; *Ketterer v. Red Star Transit Co.* (1956), 78 Ohio Law Abs. 123." *State v. Rivera* (Nov. 9, 1989), Cuyahoga App. No. 56158; see, also, *State v. Harvey* (Mar. 6, 1975), Cuyahoga App. No. 33157 (admission of parts of statement that are irrelevant or material to explanation of apparent inconsistencies is harmless error and not grounds for reversal where the record contains substantial evidence that supports the guilty verdict against the appellant.)

{¶ 48} Defendant generally asserts that he was prejudiced and denied a fair trial when Dan's entire statement was read into the record on re-direct. However, defendant does not set forth any substantive argument as to how he was prejudiced by its admission nor does he point to any portions that were irrelevant or immaterial to explain the apparent inconsistencies the defense raised on cross-examination between Dan's statement to police and his trial testimony. Finally, there is substantial evidence in the record that supports the guilty verdict against defendant. Accordingly, this assignment of error is overruled.

{¶ 49} "IV. Defendant was denied his constitutional right of confrontation when the court allowed a non-examining coroner to testify as [to] the cause of death, whose testimony the court enhanced before the jury."

**{¶ 50}** Defendant challenges the court's declaration of the Cuyahoga County Coroner as an expert and submits that the admission of his testimony violated his confrontation rights because Dr. Miller did not participate in the autopsy or the report.

**{¶ 51}** Defendant's contention that it was error to qualify Dr. Frank Miller as an expert is unsupported by the record or the law. Evid.R. 702 sets forth the instances in which a witness may be qualified as an expert, including that a person may be qualified as an expert witness if the proponent of such witness can establish that the witness has knowledge of scientific, technical, or other such specialized nature. See Evid.R. 702. The record amply reflects Dr. Miller possessed such knowledge.

**{¶ 52}** Defendant relies on *United States v. Johnson* (6th Cir. 2007), 488 F.3d 690, in arguing the court erred by identifying Dr. Miller as an expert in front of the jury. However, in *Johnson*, the Sixth Circuit upheld the trial court's classification of a police officer as an expert. Although the court in *Johnson* did indicate a preference that the trial courts refrain from advising the jury of a qualified witness's designation as an expert, it determined that the trial court had not committed plain error by doing so. In this case, the defense did not object to Dr. Miller's qualifications as an expert, the record supports his qualifications as an expert, and the court's recognition of his expert qualifications before the jury was not plain error.

**{¶ 53}** Defendant next asserts that the admission of Dr. Miller's testimony violated his right of confrontation and cross-examination based on the Supreme Court precedent of *Melendez-Diaz v. Massachusetts* (2009), _____ _____ U.S. _____, 129 S.Ct. 2527, 174 L.Ed.2d 314.

**{¶ 54}** In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court determined it is error to admit a witness's testimony against a defendant unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id. at 54.   Subsequently, the Court held in *Melendez-Diaz*, that it also violated the right to confrontation where a lab analyst's notarized certificates[4] were admitted without affording the defendant an opportunity to cross-examine the lab analyst.

**{¶ 55}** In *Melendez-Diaz*, the Supreme Court held that the certificates were testimonial in nature because they were "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" *Melendez-Diaz*, 129 S.Ct. at 2539, quoting, *Crawford*, 541 U.S. at 52.   The Court further held that the certificates did "not qualify as traditional official or business records." Id. at 2538.    The Court reasoned,"[b]usiness and public records are generally

---

[4]The certificates indicated the substance was cocaine and set forth the weight of the cocaine at issue in that prosecution.

admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here — prepared specifically for use at petitioner's trial — were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment."  Id. at 2539.

{¶ 56} After *Crawford* was decided, the Ohio Supreme Court addressed the exact issue that defendant is presenting now.  That is, whether it violated the appellant's right to confrontation when the trial court allowed the Summit County medical examiner at the time of the trial, Dr. Kohler, to testify about the decedent's autopsy even though a different doctor had conducted the autopsy.  *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621.  The court held that "under *Crawford* * * * autopsy records are admissible as nontestimonial business records."  The court went on to "conclude that Dr. Kohler's expert testimony about the autopsy findings, the test results, and her opinion about the cause of death did not violate Craig's confrontation rights." *Craig*, 2006-Ohio-4571, ¶88.  This is not in conflict with *Melendez-Diaz* because unlike the lab certificate at issue in that case, which were prepared solely for use at trial, the autopsy report was non-testimonial.

**{¶ 57}** In this case the defendant was not contesting the conclusions or opinions of the autopsy report and the findings were not central to the determination of the criminal agency. No one disputed that David Bober's death was a homicide caused by a fatal gunshot wound or that he was intoxicated on the night in question; which was essentially the substance of the coroner's testimony in this case. Accordingly, defendant's Sixth Amendment right to confrontation was not implicated or violated by the admission of Dr. Miller's testimony.

**{¶ 58}** Our conclusion is consistent with the decision reached by the Fourth Appellate District in *State v. Hardin*, Pike App. No. 10 CA 803, 2010-Ohio-6304, ¶17. In *Hardin*, the court also distinguished an autopsy report from the scope of records addressed by *Melendez-Diaz* and found it is a business record and the admission of it does not violate the right to confrontation because it is non-testimonial.

**{¶ 59}** This assignment of error is overruled.

**{¶ 60}** "Defendant was denied due process of law and his right of confrontation when the court admitted 911 calls from Dennis Smith."

**{¶ 61}** We review the admission of evidence, including 911 tapes, under the abuse of discretion standard. *State v. Kinley* (1995), 72 Ohio St.3d 491, 497, 651 N.E.2d 419.

**{¶ 62}** Defendant challenges the admission of the content of Dennis Smith's 911 calls, asserting they were inadmissible hearsay pursuant to Evid.R. 801(C).

**{¶ 63}** Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Id.

**{¶ 64}** Dan testified at trial and explained his desire to remain anonymous and that he did not want to be involved. He wanted, however, to notify police that they were searching the wrong area. He called his dad who, in turn, called 911. Thereafter, the crime scene was expanded to include Dan's residence.

**{¶ 65}** Dennis identified his voice on certain 911 tapes where he provided information to assist the police during their contemporaneous investigation. Dennis testified that his son Dan contacted him and said he had witnessed his neighbor shooting at people. Dennis made the 911 calls because he was in fear for his son's safety and because Dan indicated he did not want to be involved.

**{¶ 66}** Both Dan and Dennis Smith were available, testified at trial, and were subjected to cross-examination. Dennis even admitted that he had falsely stated that he had witnessed the shooting in his initial call to 911.

{¶ 67} When defendant raised an objection at trial to the admission of the 911 tapes made by Dennis, the court provided a limiting instruction. The jurors were told that the tapes were not being admitted to prove the truth of statements made on them but for a different purpose. As stated, it was even established that Dennis's statements were not true, specifically that he had witnessed the incident. Where the 911 tape is being offered for a reason other than to prove the truth of the matters asserted, it "does not meet the definition of 'hearsay' set forth in Evid.R. 801(C)." *Kinley,* 72 Ohio St.3d at 498.

{¶ 68} Even if the admission of Dennis's 911 calls were considered improper, it was at most harmless error. Crim.R. 52(A). The content of the subject tapes was consistent with the trial testimony of Dennis and Dan Smith. This assignment of error is overruled.

{¶ 69} "VI. Defendant was denied due process of law by reason of the conflicting and inconsistent instruction on voluntary manslaughter."

{¶ 70} "VII. Defendant was denied due process of law when the court improperly instructed on causation."

{¶ 71} Defendant did not object to the court's jury instructions relating to these assignments of error; therefore, we review them for plain error. See *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, at ¶ 25. See, also, Crim.R. 30(A). An erroneous jury instruction does not amount to

plain error unless, but for the error, the result of the trial clearly would have been different. *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804.

{¶ 72} An appellate court must view the jury instructions in the context of the overall charge rather than in isolation. *State v. Price* (1979), 60 Ohio St.2d 136, 398 N.E.2d 772. Here, considering the jury instructions as a whole, we conclude that the trial court provided the jury with adequate legal information on the elements of voluntary manslaughter and causation.

{¶ 73} With respect to the instructions on voluntary manslaughter, defendant believes the court's instructions concerning voluntary manslaughter were inconsistent. The court properly instructed the jury as to the elements of murder and voluntary manslaughter. The jurors were explicitly and plainly instructed that, in order to convict defendant of the inferior degree offense of voluntary manslaughter, it must find the presence of the additional mitigating factor that "defendant acted knowingly while under the influence of a sudden passion or in a sudden fit of rage either of which was brought on by serious provocation occasioned by David Bober that was reasonably sufficient to incite the defendant into using deadly force." The jury was instructed that defendant must prove the mitigating factor by a preponderance of the evidence.

{¶ 74} The court went on to explain that "[i]f the weight of the evidence is equally balanced or if you're unable to determine which side of an issue has

the preponderance, then it has not been established — then they have not established such issue. If the defendant fails to establish the issue of sudden passion or fit of sudden rage, the state still must prove to you beyond a reasonable doubt all of the elements of the crime charged."

{¶ 75} Although defendant finds this instruction inconsistent, the court's instructions on voluntary manslaughter were clearly stated to the jury and proper when considered in context. The subject instruction simply indicates that if the defendant did not carry his burden of establishing the mitigating factor necessary to support a voluntary manslaughter conviction, the state still bore the burden of proving the elements necessary to sustain a murder conviction beyond a reasonable doubt before it could return a guilty verdict on that charge. The defendant has not established plain error in any case. The jury clearly found that defendant had established the mitigating factor of voluntary manslaughter by a preponderance of the evidence since it convicted him of the inferior degree offense. Therefore, defendant has not established how a different instruction would have affected the outcome. The sixth assignment of error is overruled.

{¶ 76} Defendant also contends that the court's causation instructions permitted the jury to convict him even if David Bober's death was caused by another person. The court's instructions at issue track the language employed in 4 Ohio Jury Instructions 2010. Despite defendant's contentions to the

contrary, the trial court's instructions on causation were a proper statement of the law. See *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, *State v. Shopshire*, Cuyahoga App. No. 85063, 2005-Ohio-3588; *State v. Allen*, Cuyahoga App. No. 76672, 2003-Ohio-24; see, also, *State v. McClain*, Cuyahoga App. No. 77740, 2002-Ohio-2349. Defendant has not established plain error in this regard and the seventh assignment of error is overruled.

{¶ 77} "VIII. Defendant was denied due process of law when he was convicted of voluntary manslaughter."

{¶ 78} Here defendant asserts that his conviction for voluntary manslaughter was against the sufficiency of the evidence.

{¶ 79} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 80} Voluntary manslaughter is proscribed by R.C. 2903.03 as follows:

{¶ 81} "(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation

occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy."

{¶ 82} Defendant contends there is insufficient evidence to establish that he acted knowingly while under the influence of a sudden passion or fit of rage as required to submit the cause to the jury. To the contrary, the record contains testimony from multiple witnesses that David was engaged in an angry discussion with another man just prior to being shot. Both Raymond and Milton heard David yelling at another man. Milton said that man sounded agitated and mad. Dan and Crystal said they saw defendant fire a gun, after which he picked up his cell phone and said he just had to shot someone. Accordingly, there was sufficient evidence, if believed, would support a finding of the elements necessary to sustain a voluntary manslaughter conviction.

{¶ 83} "IX. Defendant was denied due process of law when the court overruled his motion for judgment of acquittal and the verdict is against the manifest weight of the evidence."

{¶ 84} Defendant argues the evidence was insufficient to support his conviction or it was against the manifest weight of the evidence concerning his identification as the shooter.

{¶ 85} The sufficiency of the evidence standard is set forth above. To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Thompkins*, supra.

{¶ 86} There is sufficient evidence to support a finding that defendant was the shooter in this case. Both Dan and Crystal testified that defendant was the shooter. This is sufficient evidence on which the jury could conclude that defendant was the shooter. Further, the identification of defendant as the shooter is not against the manifest weight of the evidence. The jury was presented with testimony from many witnesses. While Milton was unable to identify defendant as the shooter that night, he was highly intoxicated and in a state of shock. Raymond was not given an opportunity to identify defendant that night. The fact that Milton and Raymond's descriptions of the height and weight of the shooter appear inconsistent with defendant's height and weight, the fact remains that it was dark outside, the men were being shot at as they observed this person, and they were very intoxicated. Both men testified at trial that they were not good at estimating height and weight. And, Raymond testified that he believes that the description he gave that

night was wrong. Conversely, Dan and Crystal were certain in their identification of defendant as the shooter. Both of these witnesses were familiar with defendant, who was their neighbor, and they recognized his distinctive walk and voice. There is no evidence that either Dan or Crystal were under the influence of any substance that night and they both denied having used any drugs or alcohol prior to witnessing the shooting. While there were some inconsistencies in the statements made by the witnesses over the years, it was within the province of the jury to resolve the conflicts. We cannot say that the jury clearly lost its way in convicting defendant of voluntary manslaughter. This assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

MARY EILEEN KILBANE, A.J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS. (SEE ATTACHED DISSENTING OPINION).

KATHLEEN ANN KEOUGH, J., DISSENTING:

{¶ 87} I respectfully dissent. I would find merit to Monroe's first and fifth assignments of error, reverse his convictions, and remand for a new trial.

{¶ 88} In his first assignment of error, Monroe argues that he was denied due process of law and a fair trial when the court permitted the officer in charge of the scene to testify to the truth of a statement attributable to defendant.

{¶ 89} Lt. Foley testified about his interactions with Monroe while he was investigating the shooting. Lt. Foley testified that he and fellow officers went to Monroe's house after receiving information that the shooter lived in the back house of 3289 West 48th Street. When Monroe came to the front door, the officers questioned him regarding whether he had been outside earlier. Monroe responded that he had not, that he was in bed. Thereafter, the prosecutor questioned Foley about his observations of Monroe and the following colloquy occurred:

**{¶ 90}** "Q: All right. When you get to that front door, do you check him in terms of his appearance in terms of your police thinking pattern? Are you looking for anything?

**{¶ 91}** "A: Yes.

**{¶ 92}** "Q: All right. So what are you looking for?

**{¶ 93}** "A: I looked for any evidence that lets you know that he was outside.

**{¶ 94}** "Q: What do you see?

**{¶ 95}** "A: The bottom back part of his pants were wet.

**{¶ 96}** "Q: Okay. In your experience as a police lieutenant of – how many years experience?

**{¶ 97}** "A: 15 years.

**{¶ 98}** "Q: He had just told you he had not been outside, right?

**{¶ 99}** "A: That's correct.

**{¶ 100}** "Q: You saw something that in your mind did what to that statement?

**{¶ 101}** [Defense counsel objects, which is overruled.]

**{¶ 102}** "A: He lied. He hadn't –"

**{¶ 103}** [Both defense attorneys object a multiple number of times; the trial court does not make a ruling.]

**{¶ 104}** "Q:   At that moment did you believe his statement based on the visual observation of the wetness on the hem of his pants?

**{¶ 105}** "A:   No, I did not."

**{¶ 106}** [Defense counsel objects, which is overruled.]

**{¶ 107}** The admission and exclusion of evidence, including the admissibility of lay witness opinion testimony, rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion.   *State v. Allen*, Cuyahoga App. No. 92482, 2010-Ohio-9, _46. An abuse of discretion connotes more than an error in law or judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.

**{¶ 108}** The Ohio Supreme Court addressed the issue of expert witnesses testifying to the truthfulness of statements from a declarant in *State v. Boston* (1989), 46 Ohio St.3d 108, 454 N.E.2d 1220, modified on other grounds by *State v. Dever*, 64 Ohio St.3d 401, 1992-Ohio-41, 596 N.E.2d 436.   *Boston* concerned statements made in a sexual abuse case where the declarant was the child victim.   The court held that "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant."   Id. at the syllabus.   In so holding, the court explained that "'it is the factfinder, not the so-called expert or lay witnesses, who bears the burden of assessing the

credibility and veracity of witnesses.'" Id. at 129, quoting *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409.

{¶ 109} The rule in *Boston* has been applied to lay witnesses, including police officers, who testify as to the truthfulness of another. Specifically, the Ohio Supreme Court stated that "a police officer's opinion that an accused is being untruthful is inadmissible." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at _122, citing *State v. Potter*, Cuyahoga App. No. 81037, 2003-Ohio-1338, _39.

{¶ 110} The State contends that Lt. Foley's testimony about Monroe's credibility was proper, citing *State v. Axson*, Cuyahoga App. No. 81237, 2003-Ohio-2182. In *Axson*, this court held that because the defendant did not testify at trial, commenting on the credibility of the defendant did not invade the province of the jury. Id. at _68. However, I find *Axson* distinguishable for three reasons. First, this court reviewed the alleged error in *Axson* under a "plain error" analysis, which this court said "is limited to exceptionally rare cases." Id. at _64. Here, this error is reviewed under the abuse of discretion standard. Second, in *Axson*, additional evidence of guilt was placed before the jury. Id. at _68. Here, conflicting eyewitness identifications of the shooter were made and the physical evidence presented did not correspond with the testimony of the eyewitnesses who identified Monroe as the shooter. Finally, in *Axson*, this court found that the defense used the defendant's admission

that he lied to police as a tactical decision to gain credibility with the jury.  Id.  Here, Monroe did not use such tactics and did not offer any character evidence.

{¶ 111} The majority also relies on *In re: Shubutidze* in finding Lt. Foley's testimony proper.  However in *Shubutidze*, this court found the testimony proper because it was used to rebut the defendant's charge of impropriety of a witness.

{¶ 112} Accordingly, I would conclude that Foley's testimony that Monroe had "lied" and that he did not believe Monroe's statement that he was not outside expressed his opinion that Monroe was being untruthful and thus was erroneously admitted.

{¶ 113} I would further find that the admission of Lt. Foley's testimony was not harmless error.  Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  In order to find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt.  *State v. Lytle* (1976), 48 Ohio St.2d 391, 403, 358 N.E.2d 623.  A reviewing court may overlook an error where the remaining admissible evidence, standing alone, constitutes "overwhelming" proof of a defendant's guilt.  *State v. Williams* (1983), 6 Ohio St.3d 281, 290, 452 N.E.2d 1323.  "Where there is no reasonable possibility that unlawful testimony contributed to a conviction,

the error is harmless and therefore will not be grounds for reversal." *State v. Brown,* 65 Ohio St.3d 483, 485, 1992-Ohio-61, 605 N.E.2d 46.

{¶ 114} I cannot say that the admission of Foley's testimony was harmless error; this was not a case where there was overwhelming proof of Monroe's guilt such that the error was harmless beyond a reasonable doubt. The only evidence presented to the jury that Monroe was the shooter were the sometimes inconsistent and contradictory testimonies of Dan and Crystal, Dennis's 911 calls, and the inference generated from the opinion by Lt. Foley.

{¶ 115} The testimonies of Dan and Crystal contradicted each other at times and were inconsistent with their prior testimony and statements. Dan testified that he witnessed Monroe arguing with the individuals in the driveway. But, Crystal testified that Dan was on the couch during this time. Crystal testified that she could not see who Monroe was yelling at, but Dan testified that he saw a group of three or four white individuals arguing with Monroe. Dan stated that he did not see the first gun shot, but he testified that he saw Monroe put the cell phone down, pick up the gun, and shoot. Crystal's testimony, however, indicates that Dan was still sitting on the couch when the first shot occurred.

{¶ 116} Dan testified at the first trial that he remembered seeing six to eight African-American males across the street when the shooting occurred, but did not tell the police this information when he gave his initial statement.

But during this trial, he did not recall whether these individuals were there. Dan testified that there were three or four white individuals in the driveway arguing, yet he did not tell the police this information in his formal statement.

{¶ 117} Additionally, it is interesting to note that although Dan testified that he did not know these "white individuals," he knew that when they left the area, they were walking or running "toward their house." Moreover, Crystal knew the screams she heard were coming from the "house of the decedent."

{¶ 118} The only relevant physical evidence presented at trial were the shell casings, which were found in the street in the intersection of West 48th Street and Koch Court – where Raymond and Milton testified the shooting occurred. Although the State went to great lengths to elicit testimony from the responding officers regarding how shell casings are expended from a firearm, how they can bounce when they hit a hard surface, or that the casings can be kicked or moved, Officer Joseph Gulas testified that the casing he found did not appear damaged. Moreover, no shell casings were found in the driveway or surrounding area where Dan and Crystal testified the shooting occurred, which was over 52 feet away from the location of the recovered shell casings.

{¶ 119} Furthermore, Milton was unable to positively identify Monroe in the cold stand that occurred about an hour after the shooting; he told police

that Monroe appeared shorter and was too heavy to be the shooter. Milton estimated that the shooter's build was equal to his own. He testified that in 2007, he was five feet and nine inches in height and weighed approximately 230 to 240 pounds.

{¶ 120} Raymond testified that he put the shooter's build between "thin and heavy." In his formal statement to police, he referenced his own height, which was five feet and nine inches, and he told police that the shooter was taller than him. He also said the shooter weighed about 180 pounds.

{¶ 121} Both Milton and Raymond testified that they are not good at estimating height and weight, they each referenced their own build when they gave their formal statements to police, which was three years prior to the trial. Irrespective of their ability to guess the exact weight and height, a person should know whether someone is similar in height and weight to their own.

{¶ 122} The defense introduced into evidence a captured computer screen image of Monroe's booking sheet printed from the Cuyahoga County Sheriff's computer system. The image, dated two weeks after the shooting, showed front and side-profile pictures of Monroe and also contained information regarding his height and weight. According to the printout, Monroe was five feet and eight inches and weighed 380 pounds at the time of his arrest.

{¶ 123} Finally, even though Lt. Foley believed that Monroe was being untruthful and that the police knew that Dan Smith and Crystal identified

Monroe as the shooter, Monroe was not arrested that evening nor was a search of his home conducted for any weapon. He was free to go home after the cold stand where Milton stated that Monroe was not the shooter.

{¶ 124} In light of these inconsistencies in the evidence, I would not say that overwhelming proof of Monroe's guilt existed and that Lt. Foley's opinion testimony was harmless beyond a reasonable doubt. I would sustain Monroe's first assignment of error.

{¶ 125} I would also find merit in Monroe's fifth assignment of error, where he argues that his right of confrontation and cross-examination was violated when the court admitted and allowed the 911 calls made by Dennis Smith to be played before the jury. The admission of these calls does not invoke the right of confrontation under the Confrontation Clause because the caller, Dennis Smith, testified at trial regarding the tapes. Rather, the correct challenge to the tapes is that they were hearsay.

{¶ 126} Dennis Smith called 911 three times. The first time he called, he gave the 911 operator a "tip." He told the operator that he witnessed the shooting, he identified who committed the act, and he indicated where police could find evidence, based "upon what he saw." Dennis Smith essentially pretended to be his son. In the two subsequent calls, Dennis revealed that he was not a witness to the shooting, but was calling on behalf of his son because his son was scared of getting involved and of Monroe. Dennis had no

first-hand knowledge of the events he was describing to the operator, and was only relaying information told to him by his son. This is classic hearsay.

{¶ 127} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(c).

{¶ 128} Typically, 911 calls fall under an exception to the hearsay rule because they are admissible either as excited utterances under Evid.R. 803(2) or present-sense impressions under Evid.R. 803(1). See *State v. Rose*, Cuyahoga App. No. 89457, 2008-Ohio-1263, citing *State v. Banks*, Franklin App. No. 03AP-1286, 2004-Ohio-6522. However, in this case, Dennis Smith was relaying to the 911 operator what his son previously told him. This is not an excited utterance or a present sense impression because there was time for reflection by both Dennis Smith and Dan.

{¶ 129} The majority opinion finds that the tapes are not hearsay because they were offered for a different reason other than to prove the truth of the matter asserted based on the trial court's limiting instruction. At the request of the defense, the trial court gave the following limiting instruction: "Ladies and Gentlemen, this might be a good time to say, this tape is coming in for a – not for the truth of what is being – the truth of the matter asserted in this trial, but as an ability for you – for the witness to explain what he did." I would find this instruction insufficient because if the 911 calls were being

used to "explain what [Dennis] did," the witness could have merely testified that he called 911 after speaking with his son.

{¶ 130} The State contends that the purpose of Dennis Smith's 911 calls and statements contained therein were solely to assist an ongoing emergency and that the calls assisted the police in expanding their crime scene to include Dan and Crystal's driveway. Upon review of the 911 calls placed by Dennis Smith, I find that the first minute of his first call would have been sufficient to achieve the State's identified purpose. The continuation of the call, including the identification of the shooter and what the caller allegedly witnessed, and the two subsequent calls, was improper and inadmissible as hearsay because the caller did not have any firsthand information or knowledge of the events he was describing.

{¶ 131} Other admissible evidence was presented by the State to achieve its stated purpose. Specifically, Dan testified that he called his father and asked him to call the police to tell them that they were looking in the wrong location for evidence. Officers testified that they received information from a 911 caller that the crime scene should be expanded to include the driveway located at 3289 W. 48th Street. The testimony by these other witnesses achieved the State's purpose of explaining subsequent conduct by the officers in furtherance of their investigation and why the police expanded the crime scene.

{¶ 132} The content of Dennis Smith's 911 calls provided no additional information to assist the jury in its determination of the case because Dan testified regarding what he witnessed, what he did, and how he reacted. The jury should not have heard his testimony second-hand through his father's 911 calls.

{¶ 133} Reviewing the entire record, I would find that the admission of the 911 calls made by Dennis Smith, even with the limiting instruction, was not harmless error. The 911 tapes were used only to incite the passion and prejudice of the jury by hearing Dennis Smith tell the operator multiple times how "scared to death" his son was of Monroe, and that his son was afraid of getting "accused of ratting" out someone.

{¶ 134} The cumulative effect of these errors, i.e. Foley's opinion testimony and the playing of Dennis Smith's 911 calls, deprived Monroe of a fair trial. See *State v. Demarco* (1987), 31 Ohio St.3d 191, 196, 509 N.E.2d 1256 (conviction may be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial). I make this finding while recognizing that because voluntary manslaughter is an inferior offense to murder, if a new trial would be given to Monroe, the new trial would be on the original charge of murder. *State v. Duncan*, 154 Ohio App.3d 254, 2003-Ohio-4695, 796 N.E.2d 1006, _45.

{¶ 135} Although Monroe does not raise this issue as an assignment of error, I find it worth discussing and actually, troubling, by the fact that the trial court gave a voluntary manslaughter instruction.

{¶ 136} Voluntary manslaughter is not a lesser included offense of murder, but an inferior degree of murder. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. Nevertheless, "a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Shane*, citing *State v. Tyler* (1990), 50 Ohio St.3d 24, 37, 553 N.E.2d 576.

{¶ 137} R.C. 2903.03(A), Ohio's voluntary manslaughter statute, states: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]"

{¶ 138} An instruction on voluntary manslaughter is warranted only when there is "evidence of reasonably sufficient provocation occasioned by the victim[.]" *Shane* at paragraph one of the syllabus. For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control. Id. at 635. "If insufficient evidence of provocation is presented, so that no reasonable jury

would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." Id. at 634.

{¶ 139} Although Monroe requested the instruction, and the State did not object, the trial court, as the gatekeeper of evidence, should have denied the request, because the evidence of provocation simply did not exist.

{¶ 140} "Serious provocation" needs to be "occasioned by the victim," here, David Bober. R.C. 2903.03. There was absolutely no evidence that the argument in the driveway was between Monroe and David. Although there was testimony that Monroe was arguing with a "white guy," there was no testimony that established that the "white guy" was David.

{¶ 141} Assuming arguendo that the "white guy" was the victim, the law is clear that "words alone will not constitute reasonable sufficient provocation to incite the use of deadly force in most situations." *Shane* at 637. See, also, *State v. Ballinger*, Cuyahoga App. No. 79974, 2002-Ohio-2146; *State v. Collins* (1994), 97 Ohio App.3d 438, 646 N.E.2d 1142. Dan Smith and Crystal testified that although they heard Monroe yelling at someone, they both said that he was talking on his cell phone, put the phone down, fired the gun, then put the cell phone back to his ear and stated "nonchalantly" and "casual as hell" that he had to shoot someone. This does not sound like someone "under the influence of sudden passion or in a sudden fit of rage."

{¶ 142} Moreover, both Raymond and Milton testified David and the shooter were arguing, but no testimony was given that they were engaged in anything but an argument. Accordingly, even if the shooter was "agitated and mad" or an "angry discussion" occurred, this would be insufficient to warrant an instruction on voluntary manslaughter.

{¶ 143} The alleged provocation by the victim was not reasonably sufficient provocation under R.C. 2903.03. Therefore, the trial court should not have instructed the jury on voluntary manslaughter because the mitigating evidence did not exist to warrant a jury instruction on voluntary manslaughter.